# EXHIBIT "B"

**ASSET PURCHASE AGREEMENT**

**dated as of February 19, 2021**

**among**

**GRASAN EQUIPMENT CO.,**

**as Seller**

**and**

**TEREX USA, LLC**

4811-7444-8605

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 1
    1.1    Definitions ........................................................................... 1
    1.2    Rules of Construction ..................................................... 7
ARTICLE II PURCHASE AND SALE ..................................................................... 8
    2.1    Purchase and Sale of Assets ......................................... 8
    2.2    Excluded Assets ............................................................. 9
    2.3    No Liabilities Assumed .................................................. 9
ARTICLE III CLOSING ........................................................................................ 11
    3.1    Purchase Price ............................................................... 11
    3.2    Closing ............................................................................ 11
    3.3    Deliveries by the Seller ................................................. 11
    3.4    Deliveries by Purchaser ................................................ 12
    3.5    Further Assurances ........................................................ 12
    3.6    Allocation of Purchase Price ........................................ 12
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ...................... 12
    4.1    Organization, Standing .................................................. 13
    4.2    Validity of Agreement; Power ....................................... 13
    4.3    No Conflicts or Violations ............................................. 13
    4.4    Title to Assets ................................................................ 13
    4.5    Environmental Matters ................................................... 14
    4.6    Brokers ........................................................................... 15
    4.7    [Reserved] ...................................................................... 15
    4.8    Information Accurate and Complete; Reliance ............. 15
    4.9    Closing Date ................................................................... 15
ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 15
    5.1    Organization ................................................................... 16
    5.2    Validity of Agreement; Power ....................................... 16
    5.3    No Conflicts or Violations ............................................. 16
ARTICLE VI PRE-CLOSING COVENANTS .......................................................... 16
    6.1    Consents and Approvals ................................................ 16
    6.2    Access to Information and Facilities ............................. 17
    6.3    Notification of Certain Matters ..................................... 17
    6.4    Bankruptcy Actions ....................................................... 17
    6.5    Other Bids ...................................................................... 18
    6.6    Bankruptcy Matters ....................................................... 18
    6.7    [Reserved] ...................................................................... 18
ARTICLE VII CONDITIONS TO CLOSING .......................................................... 18
    7.1    Conditions to Parties' Obligations ............................... 19
    7.2    Conditions to Purchaser's Obligations ........................ 19
    7.3    Conditions to the Seller's Obligations ......................... 20
ARTICLE VIII TERMINATION. .......................................................................... 20
    8.1    Termination .................................................................... 20
    8.2    Expense Reimbursement and Breakup Fee. ................. 21

| | | |
|---|---|---|
| 8.3 | Effect of Termination or Breach | 22 |
| ARTICLE IX POST-CLOSING COVENANTS | | 22 |
| 9.1 | Certain Consents | 23 |
| 9.2 | Name Changes | 23 |
| 9.3 | Accounts Receivable; Collections | 23 |
| 9.4 | Confidentiality | 23 |
| 9.5 | Taxes | 23 |
| 9.6 | Access | 24 |
| ARTICLE X MISCELLANEOUS | | 24 |
| 10.1 | Non-Survival of Representations and Warranties | 24 |
| 10.2 | Expenses | 24 |
| 10.3 | Amendment | 25 |
| 10.4 | Waivers | 25 |
| 10.5 | Notices | 25 |
| 10.6 | Counterparts; Electronic Execution | 27 |
| 10.7 | Headings | 27 |
| 10.8 | SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY | 27 |
| 10.9 | Governing Law | 27 |
| 10.10 | Binding Nature; Assignment | 28 |
| 10.11 | No Third Party Beneficiaries | 28 |
| 10.12 | Severability | 28 |
| 10.13 | Construction | 28 |
| 10.14 | Public Announcements | 28 |
| 10.15 | Entire Understanding | 29 |
| 10.16 | Closing Actions | 29 |
| 10.17 | Conflict Between Transaction Documents | 29 |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Reserved |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Intellectual Property Assignment |

**SCHEDULES**

| | |
|---|---|
| Schedule 2.1 | Certain Tangible Acquired Assets |
| Schedule 4.5(a) | Environmental Permits |
| Schedule 4.5(d) | Hazardous Substance Storage Areas |

4811-7444-8605

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of February 19, 2021 by and between Grasan Equipment Co., an Ohio corporation ("Seller"), and Terex USA, LLC. a Delaware Corporation ("Purchaser").

WHEREAS, Seller desires to sell, contribute, convey, assign, transfer and deliver to Purchaser, and Purchaser desires to purchase, acquire and take assignment and delivery of, all of the Acquired Assets (as defined herein).

NOW THEREFORE, In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Definitions.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means all accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(e).

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of any of the Acquired Assets pursuant to one or more transactions, the sale of any of the outstanding shares of capital stock or equity interests of Seller (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more Third Parties and Seller, in each case excluding sales of inventory in the Ordinary Course of Business.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by contract, through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all of the Exhibits and Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 3.6.

"Bankruptcy Code" means Title 11 of the United States Code.

4811-7444-8605

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Ohio.

"Books and Records" means all books, ledgers, files, reports, plans, drawings and operating records of every kind, including all records and lists of the Seller relating to (i) inventory, merchandise analysis, product, business and marketing plans, marketing reports, research and development materials and creative material, (ii) customers, suppliers or personnel of Seller (including customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), and (iii) accounting records, Tax records and Tax Returns; provided, however, that "Books and Records" shall not include the originals of Seller's minute books, stock books or Tax Returns.

"Breakup Fee" has the meaning set forth in Section 8.2(b).

"Business" means the current and past business activities of Seller related to the Acquired Assets and/or the Premises.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of New York are authorized by Law to close.

"Chapter 11 Case" means the case commenced by the Seller under chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.2.

"Closing Date" has the meaning set forth in Section 3.2.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any Contract or other binding agreement or arrangement (written or oral) with any labor union or organization, works council or other employee representative.

"Contract" means any agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, whether written or oral, and with respect to any Contract to which Seller is a party, such contract which Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Electronic Delivery" has the meaning set forth in Section 10.6.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any Liability.

2

"Environmental Claim" has the meaning set forth in <u>Section 4.5(b)</u>.

"Environmental Laws" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, natural resources, or pollution or protection of the environment.  For purposes of the foregoing, "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 <u>et</u> <u>seq</u>.) and any Laws promulgated thereunder.

"Environmental Liabilities" means any and all Liability (including any investigatory, corrective or remedial obligation) arising under Environmental Laws, including any such Liability relating to (i) Seller or any predecessor or Affiliate of Seller, (ii) the operation of the business of Seller prior to the Closing, (iii) any property, asset or interest of Seller (whether an Acquired Asset or Excluded Asset), (iv) any property, facility, or location, or (v) any operations, events, facts, conditions, or circumstances occurring or existing on or prior to the Closing Date, including any Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to Hazardous Substances occurring or existing on or prior to the Closing Date (whether or not constituting a breach of any representation or warranty herein).

"Environmental Permits" has the meaning set forth in <u>Section 4.5(a)</u>.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"Excluded Assets" has the meaning set forth in <u>Section 2.2</u>.

"Excluded Liabilities" has the meaning set forth in <u>Section 2.3</u>.

"Exhibits" means the exhibits attached hereto.

"Expense Reimbursement" has the meaning set forth in <u>Section 8.2(a)</u>.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or

4811-7444-8605

other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Indebtedness" means, with respect to any Person as of any date of determination, without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts, (v) all obligations arising from deferred compensation arrangements, (vi) all obligations of such Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, (vii) all guaranties or assurances of such Person in connection with any of the foregoing, (viii) all capital lease obligations, (ix) all deferred rent, (x) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise, (xi) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) all obligations (determined on the basis of actual, not notional, obligations) with respect to interest rate protection agreements, interest rate swap agreements, foreign currency exchange agreements, or other interest or exchange rate hedging agreements or arrangements, (xiii) all other liabilities classified as liabilities in accordance with GAAP as of the date of determination of such Indebtedness, and (xiv) all fees, accrued and unpaid interest, premiums or penalties related to any of the foregoing.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical, product and marketing data, financial and marketing plans, customer and supplier lists, customer and product sales history and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

4

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory and other similar items.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability, infringement liability or Environmental Liability.

"Lien" or "Liens" means any claim, lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Purchaser is a successor, transferee or continuation of any or all Seller, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate, is or could reasonably be expected to be materially adverse to, or materially impairs the value of, the Acquired Assets, or which materially impairs the ability of Seller to perform its obligations under this Agreement or has a material adverse effect on or prevents or materially delays the consummation of the transactions contemplated hereby; provided, that the act of filing the Chapter 11 Case in and of itself shall not constitute a Material Adverse Effect.

"Notice" means any summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or any other Governmental Authority, or any other entity or any individual, and shall include the imposition of any Lien on property owned, leased, occupied or used by Seller pursuant to any Environmental Law.

"Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

4811-7444-8605

"Ordinary Course of Business" means the operation of the business of the Seller in the usual and ordinary course in the manner operated prior to the cessation of operations that occurred on November 20, 2020 (including with respect to quantity and frequency).

"Permits" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"Petition Date" means the date of the filing of the chapter 11 petitions of the Seller.

"Premises" shall mean the approximately 9.3-acre land, buildings, and fixtures located at 440 South Illinois Avenue, Mansfield, Ohio 44907.

"Proceeding" means any action, claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or cause of action of whatever kind or character.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble hereto.

"Real Estate Sale" shall mean that transaction by and between Purchaser or the applicable Purchaser Affiliate and RES for the sale of the real estate and fixtures located at the Premises.

"Release" means any release, emission, disposal, leaching, spilling, pumping, emptying, discharging, injecting, escaping, dumping, filling, leaking or migration into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Substances) or any structure, facility or property.

"RES" means 440 S. Illinois Limited Partnership, an Ohio limited partnership.

"Restricted Names" has the meaning set forth in Section 9.2.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Motion" has the meaning set forth in Section 6.4(a).

"Sale Order" means the Final Order of the Bankruptcy Court, in form and substance acceptable to Purchaser in its sole discretion, to be entered by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, which Final Order, amongst other approvals, approves the sale of the Acquired Assets to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code in form substantially similar to Exhibit B, as such may be modified with Purchaser's consent.

6

"<u>Seller</u>" has the meaning set forth in the preamble hereto.

"<u>Tax</u>" and, with correlative meaning, "<u>Taxes</u>" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, customs duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever and denominated by any name whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign), whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any "affiliated group" (as such term is defined in Section 1504 of the Code) or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law of which Seller is or has been a member, or being included (or required to be included) in any Tax Return relating thereto.

"<u>Tax Return</u>" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"<u>Third Party</u>" means any Person other than the Seller, Purchaser or any of their respective Affiliates.

"<u>Transaction Documents</u>" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, or local Law, regulation or ordinance.

1.2     <u>Rules of Construction</u>.  Unless the context otherwise clearly indicates, in this Agreement:

(a)     the singular includes the plural;

(b)     "includes" and "including" are not limiting;

(c)     "may not" is prohibitive and not permissive; and

(d)     "or" is not exclusive.

7

4811-7444-8605

# ARTICLE II
# PURCHASE AND SALE

2.1  <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, whether arising prior to, on or subsequent to the Petition Date, and Purchaser shall purchase, acquire and take assignment and delivery of, for the Purchase Price, all rights, titles and interests of every kind and nature of the Seller (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) listed below of the Seller as of the Closing Date, whether tangible or intangible, wherever located and by whomever possessed (collectively, the "<u>Acquired Assets</u>"):

(a)  all tangible personal property, including all machinery, equipment (including all transportation and office equipment), computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind, in each case owned by the Seller, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Seller or any other space where any of the Seller' properties and or any other assets may be situated, and including all Permits and warranties, to the extent relating (directly or indirectly) to the foregoing;

(b)  [reserved];

(c)  all concrete forms, braces, beams, joists, walers, turnbuckles, lifting systems, forming accessories, ties, safety equipment and brackets, shoring equipment and bridge brackets owned by Seller;

(d)  [reserved];

(e)  all Intellectual Property owned by Seller, along with all income, royalties, damages and payments due or payable to Seller as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Seller's possession or control (collectively, the "<u>Acquired Intellectual Property</u>");

(f)  all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials; and

(g)  the equipment and inventory set forth on <u>Schedule 2.1</u>.

8

2.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, each of the properties, assets and rights (contractual or otherwise) of the Seller, whether tangible or intangible, wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt all of the properties, assets and rights identified in this Section 2.2, but specifically excluding the Acquired Assets, shall be retained by the Seller and shall not be sold or transferred to, or purchased by, Purchaser (all of the properties, assets and rights excluded pursuant to this Section 2.2 collectively, the "Excluded Assets"):

(i)    any equity interests held by Seller in any Person (including any other Seller or any subsidiary thereof); and

(ii)    all causes of action arising under the Bankruptcy Code against Third Parties.

2.3    No Liabilities Assumed.

(a)    Purchaser shall not be the successor of Seller, and Seller acknowledges and agrees that Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of Seller or relating to or arising out of the business of the Seller, the Excluded Assets or the Acquired Assets (including Liabilities relating to the pre-petition or post-petition operation of the business of the Seller, the Excluded Assets or to the Acquired Assets (or the use thereof)), whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of Seller or any predecessor or Affiliate of Seller whatsoever or any ERISA Affiliate (any and all such obligations or Liabilities, "Excluded Liabilities"); provided, that, in furtherance and not in limitation of the foregoing, Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

(i)    all claims or Liabilities of Seller that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases;

(ii)    all Liabilities of Seller relating to Taxes;

(iii)    all accounts payable arising prior to the Closing;

(iv)    all Liabilities in respect of Indebtedness;

(v)    all Environmental Liabilities regardless of whether such Liabilities accrue or attach to the Seller or to any other Person in the first instance;

(vi)    all Liabilities that may exist or may in the future arise pursuant to the WARN Act relating to any action or inaction of the Seller prior to or upon the Closing;

(vii)    all Liabilities of the Seller resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Seller (or any of its current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by Seller at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings

9

against Seller whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(viii)    all Liabilities arising out of any Proceeding commenced against Seller or any predecessor or Affiliate of Seller after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(ix)    all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the business of the Seller or any act or omission of Seller or any predecessor or Affiliate of Seller prior to the Closing;

(x)    all Liabilities arising out of, or relating to, any indemnification obligations of Seller, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller or any of its Affiliates;

(xi)    all Liabilities with respect to the employees or former employees, or both (or their representatives) of Seller arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of Seller;

(xii)    all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any Liability;

(xiii)    all Liabilities arising out of or relating to services, products or product or service warranties of Seller or any predecessor or Affiliate of Seller to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

(xiv)    all Liabilities of Seller to any current, former or prospective stockholder or other equity interest holder of Seller, including all Liabilities of Seller related to the right to or issuance of any capital stock or other equity securities;

(xv)    all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Case or otherwise;

10

(xvi)    all Liabilities of Seller or any predecessor or Affiliate of Seller based upon such Person's acts or omissions occurring after the Closing; and

(xvii)    all Liabilities of Seller to Purchaser.

(b)    The Seller hereby indemnifies and shall hold Purchaser and each of its Affiliates and each of their respective officers, directors, managers, equity holders, partners, employees, agents and representatives and any Person claiming by or through any of them harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, damage, Liability, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets and the Excluded Liabilities.

## ARTICLE III
## CLOSING

3.1    <u>Purchase Price</u>.    The aggregate consideration for the Acquired Assets shall be $200,000 paid in cash on the Closing Date. The sum of $20,000 has been deposited with Purchaser's counsel. In the event this Agreement is terminated pursuant to Section 8.1, Purchaser shall be refunded the deposit.

3.2    <u>Closing</u>.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Thompson Hine LLP, 10050 Innovation Dr. #400, Miamisburg, Ohio at 10:00 a.m. or by the Electronic Delivery of documents as soon as practicable after the date on which the conditions set forth in <u>Article VII</u> have been satisfied or waived but no later than three (3) days thereafter; or on such other date or place as Purchaser and Seller may determine (the "<u>Closing Date</u>").

3.3    <u>Deliveries by the Seller</u>.    At the Closing, the Seller shall deliver or procure delivery to Purchaser of:

(a)    physical possession of all of the Acquired Assets capable of passing by delivery, it being understood that title in such Acquired Assets shall pass to Purchaser at the Closing notwithstanding any delay or failure in such delivery;

(b)    one (1) or more bills of sale, in the form attached hereto as <u>Exhibit C</u>, duly executed by the Seller, conveying in the aggregate all of the owned personal property of the Seller included in the Acquired Assets;

(c)    Intellectual Property assignments in the forms attached hereto as <u>Exhibit D</u>, each duly executed by the Seller and each in recordable form to the extent necessary to assign such rights;

(d)    [Reserved];

(e)    certified copies of the resolutions of the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

4811-7444-8605

(f)     all of the Books and Records;

(g)     evidence, reasonably satisfactory to Purchaser, of the required name changes of the Seller and each of their respective Affiliates as more fully set forth in Section 9.2;

(h)     such documents, instruments, and consideration due from RES required to close the Real Estate Sale;

(i)     such other instruments as are necessary to vest in Purchaser good and marketable title in and to the Acquired Assets in accordance with the provisions hereof; and

(j)     such other documents or instruments as are required to be delivered by Seller at the Closing pursuant to the terms hereof or that Purchaser reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

3.4     <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to the Seller:

(a)     such documents, instruments, and consideration due from Purchaser or the applicable Purchaser Affiliate required to close the Real Estate Sale; and

(b)     such other documents, instruments and certificates as the Seller may reasonably request.

3.5     <u>Further Assurances</u>.  From time to time prior to and after the Closing and without further consideration, the Seller, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby, to vest in Purchaser title to the Acquired Assets transferred hereunder and to permit Purchaser to perfect, record or protect its interests in the Acquired Assets, or to otherwise more fully consummate the transactions contemplated by this Agreement.

3.6     <u>Allocation of Purchase Price</u>.  Purchaser shall, within the later of (i) ninety (90) days after the Closing Date, or (ii) thirty (30) days prior to the date by which the Seller' federal income Tax Returns must be filed, prepare and deliver to the Seller a schedule allocating the amount treated as the purchase price for federal, state and other applicable income tax purposes among the Acquired Assets (such schedule, the "<u>Allocation</u>"), in accordance with Section 1060 of the Code and the Treasury regulations thereunder (and any similar provision of state, local, or foreign Law).  The Allocation (including the amount of the purchase price for tax purposes) shall be binding upon the Seller.  Purchaser and the Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law.  Purchaser and the Seller shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.6</u> shall survive the Closing without limitation.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

4811-7444-8605

The Seller represents and warrants on the date of this Agreement and on the Closing Date to Purchaser that the statements contained in this Article IV are materially correct and complete to the best of the knowledge of each officer and director of each of the Seller.

4.1     Organization, Standing.  Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, is qualified to do business in every jurisdiction in which it is required to be qualified and has all requisite corporate or similar power and authority and all Permits necessary to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing or with active status as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, in good standing or to have such power or authority, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.2     Validity of Agreement; Power.  Subject to any necessary authorization from the Bankruptcy Court, Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The board of directors of Seller has duly approved the Transaction Documents to which such Person is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby.  No other corporate or organizational proceedings on the part of Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Seller is a party and the consummation by such Seller of the transactions contemplated thereby.  Subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms.

4.3     No Conflicts or Violations.  The execution, delivery and, subject to the approval of the Bankruptcy Court, performance of the Transaction Documents and the consummation of the transactions contemplated thereby, by the Seller do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority, under (i) any provision of the certificate of incorporation or bylaws of Seller, (ii) any Contract to which Seller is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to Seller or its property or assets.

4.4     Title to Assets.

(a)     The Seller has good and marketable title to, and own and possess all rights and interests in, including the right to use, each of the Acquired Assets, including all Acquired Intellectual Property.

(b)     Subject to Bankruptcy Court approval, the Seller has the power and the right to sell, assign and transfer and, at the Closing, the Seller will sell and deliver to Purchaser and

13

Purchaser will acquire from the Seller, good and marketable title to the Acquired Assets, free and clear of all Liens.

        (c)      RES has good and marketable title to the Premises.

    4.5    <u>Environmental Matters</u>[1].

        (a)      To Seller's knowledge, and except for information disclosed to Purchaser pursuant to Purchaser's due diligence, Seller has been and currently is in compliance with all Environmental Laws, which compliance includes, but is not limited to, the possession by Seller of all Permits required under Environmental Laws ("<u>Environmental Permits</u>") and compliance with the terms and conditions thereof. All Environmental Permits currently held by Seller are identified in <u>Schedule 4.5(a)</u> and represent all Environmental Permits necessary for the operation of the Business as currently conducted, except for that information disclosed to Buyer pursuant to Purchaser's environmental due diligence. Seller has not been notified by any relevant governmental authority that any such Environmental Permit will be modified, suspended or revoked or cannot be renewed in the ordinary course of business consistent with past practice.

        (b)      There is no claim, action, investigation or notice by any relevant governmental authority alleging liability arising out of, based on or resulting from (x) the Release of any Hazardous Substance at, to, or from the Premises or (y) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law ("<u>Environmental Claim</u>") pending or, to Seller's knowledge, threatened against Seller in connection with the Business or the Premises and, to Seller's knowledge, there are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release of any Hazardous Substances or violation of any Environmental Law, that could form the basis of any Environmental Claim in connection with the Seller's Business or the Premises.

        (c)      To Seller's knowledge and except for information disclosed to Purchaser pursuant to Purchaser's due diligence, there have been no Releases of Hazardous Substances at, from or to the Premises which required or may require investigation, cleanup, or other corrective action pursuant to Environmental Laws. The Premises is not subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law and has not been the subject of any environmental investigation, cleanup or other corrective action.

        (d)      To Seller's knowledge, there are no underground storage tanks, landfills, pits, lagoons or septic tanks currently or formerly on the Premises in which Hazardous Substances have been placed, stored or disposed.

        (e)      To Seller's knowledge, Seller has delivered to Purchaser true, correct and complete copies of all reports, correspondence and other documents concerning environmental conditions at the Premises and Seller's and the Premise's compliance with Environmental Laws.

---

[1] NTD: Subject to final review by Environmental Counsel

4811-7444-8605

4.6  <u>Brokers</u>.  The Seller has not incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby for which Purchaser or any of its Affiliates could become liable.

4.7  [Reserved].

4.8  <u>Information Accurate and Complete; Reliance</u>.  Without limiting the specific language of any other representation or warranty herein, all information furnished or to be furnished by, or on behalf of, the Seller to Purchaser in this Agreement or otherwise delivered or disclosed or to be delivered or disclosed by, or on behalf of, the Seller to Purchaser or any of Purchaser's Affiliates is or will be accurate and complete, includes or will include all material facts required to be stated therein, and does not and/or will not contain any untrue statement of a material fact or omit any material fact necessary to make the statements therein not misleading.  There is no fact which has not been disclosed to Purchaser which has or could reasonably be expected to have a Material Adverse Effect.

4.9  <u>Closing Date</u>.  All of the representations and warranties contained in this <u>Article IV</u> are true and correct on the date of this Agreement and shall be true and correct on the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to the Seller on the date of this Agreement and on the Closing Date that the statements contained in this <u>Article V</u> are materially correct and complete to the best of the knowledge of each officer and director of Purchaser.

4811-7444-8605

5.1     Organization.  Purchaser is a corporation validly existing and in good standing under the Laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

5.2     Validity of Agreement; Power.  Purchaser has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The board of directors of Purchaser has duly approved the Transaction Documents to which Purchaser is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby.  No other corporate or organizational proceedings on the part of Purchaser are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Purchaser is a party or the consummation by Purchaser of the transactions contemplated thereby. The Transaction Documents to which Purchaser is a party constitute valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms (except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar laws affecting creditors' rights generally and by general equitable principles).

5.3     No Conflicts or Violations.  The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby, by Purchaser do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority other than the Bankruptcy Court, under (i) any provision of the certificate of incorporation or bylaws of Purchaser, (ii) any contract to which Purchaser is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to Purchaser or its property or assets.

**ARTICLE VI**
**PRE-CLOSING COVENANTS**

6.1     Consents and Approvals.

(a)     Consents.  The Seller shall, at its sole cost and expense, use reasonable best efforts to (i) obtain all necessary approvals to consummate the purchase and sale of the Acquired Assets, together with any other necessary approvals to consummate the transactions contemplated hereby, including the Sale Order without modification except as Purchaser may in its sole discretion consent, and (ii) make, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of the Seller or any of their respective Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby.

(b)     Governmental Consents.  Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

4811-7444-8605

6.2    Access to Information and Facilities.  Prior to the Closing Date, Purchaser, each of Purchaser's Affiliates, and each of their respective representatives shall have full and complete access to all facilities of Seller and shall be entitled to make such investigation of the properties, businesses and operations of Seller (including conducting a physical inventory of the Inventory) and such examination of the Books and Records and financial condition of Seller as any of them may in its sole discretion request and to make extracts and copies of the Books and Records; provided, that no investigation pursuant to this Section 6.2 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

6.3    Notification of Certain Matters.

(a)    The Seller shall give notice to Purchaser of (i) the occurrence or nonoccurrence of any event that would be likely to cause either (A) any representation or warranty of the Seller contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing or (B) directly or indirectly, any Material Adverse Effect, and (ii) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.  Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 6.3(a) shall not be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or limit or otherwise affect the remedies available to Purchaser hereunder.

(b)    The Seller shall add Purchaser, and Purchaser's counsel, to the Seller's list of entities entitled to notice pursuant to Rule 2002 and otherwise provide notice to Purchaser of all matters that are required to be served on the Seller' creditors pursuant to the Bankruptcy Code and Rules.

6.4    Bankruptcy Actions.

(a)    Within ten days following the Petition Date, the Seller shall file with the Bankruptcy Court a motion, in form and substance approved by Purchaser, to approve the transactions contemplated hereby ("Sale Motion"), which motion shall seek the Bankruptcy Court's approval of this Agreement and Seller's performance under this Agreement.

(b)    The Seller shall use its best efforts to obtain entry of the Sale Order within sixty (60) days of the Petition Date and consummate the Closing as soon as practicable after the Bankruptcy Court enters the Sale Order and no later than three (3) days following the date on which the Sale Order becomes a final, non-appealable order.

(c)    The Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions and supporting papers prepared by the Seller (including forms of Orders and Notices to interested parties) that relate to the transactions contemplated in this Agreement prior to the filing thereof in the Chapter 11 Case.  All motions, applications, petitions, schedules and supporting papers prepared by the Seller and relating to the transactions contemplated by this Agreement to be filed by or on behalf of the Seller after the date hereof must be in form and substance satisfactory to Purchaser in its sole discretion.

4811-7444-8605

(d)     The Seller agrees that it will promptly take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by the Seller of its obligations under this Agreement and the Transaction Documents and demonstrating that Purchaser is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(e)     The Seller shall execute such documents and use their best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties and to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby). The Seller shall use their best efforts to fulfill or obtain the fulfillment of the conditions set forth in Sections 7.1 and 7.2.

6.5     Other Bids.  Purchaser acknowledges that the Seller may solicit bids from other potential purchasers for the sale of at least ninety percent (90%), by value, of the Acquired Assets, on terms and conditions substantially the same as or more favorable to the Seller than this Agreement; provided, however, that in the event any Acquisition Proposal is made to Seller, Seller shall promptly notify Purchaser and provide a period reasonable under the circumstances (but in no event, less than the period Seller may have to respond to the Acquisition Proposal) to furnish a higher or better offer.

6.6     Bankruptcy Matters.

(a)     The Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval.  The Seller and Purchaser acknowledge that to obtain such approval, the Seller must demonstrate that its has taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(b)     In the event an appeal is taken or a stay pending appeal is requested from entry of the Sale Order, the Seller shall immediately notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related Notice of appeal or Order of stay. The Seller shall also provide Purchaser with written notice of any motion or application filed by the Seller in connection with any appeal from the Sale Order.

6.7     [Reserved].

**ARTICLE VII**
**CONDITIONS TO CLOSING**

4811-7444-8605

7.1     Conditions to Parties' Obligations.  The obligations of Purchaser and the Seller to consummate the purchase and sale of the Acquired Assets contemplated hereunder are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)     Required Approvals.  The Bankruptcy Court shall have entered an order approving this Agreement and the consummation by the Seller of the transactions contemplated hereby, and such order shall not be subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(b)     No Order.  No Order shall have been issued by any Governmental Authority restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

7.2     Conditions to Purchaser's Obligations.  The obligations of Purchaser to consummate the purchase of the Acquired Assets contemplated hereunder are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser:

(a)     Accuracy of Representations and Warranties.  All of the representations and warranties set forth in Article IV shall be true and correct in all material respects as of the Closing Date.

(b)     Performance of Covenants.  The Seller shall have performed and complied with in all material respects the obligations and covenants required by this Agreement to be performed or complied with by the Seller on or prior to the Closing Date.

(c)     Officer's Certificate.  The Seller shall deliver to Purchaser a certificate signed by an executive officer of Seller, dated the date of the Closing Date, in form and substance reasonably satisfactory to Purchaser, certifying that the conditions specified in Sections 7.1 and 7.2 have been satisfied as of the Closing;

(d)     Bankruptcy Condition.

(i)     The Sale Order shall have been entered by the Bankruptcy Court.

(ii)     Notwithstanding Sections 7.1, 7.2 and 3.2, nothing in this Agreement shall preclude Purchaser or the Seller from consummating the transactions contemplated hereby if Purchaser, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders.  No notice of such waiver of this or any other condition to Closing need be given except to any official committee appointed in the Chapter 11 Cases and the United States Trustee, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of Final Orders.

(e)     [Reserved].

4811-7444-8605

(f)     Closing Deliveries.  The Seller shall have delivered to Purchaser the items set forth in Section 3.3, including all documents, instruments and consideration required to close the Real Estate Sale.

(g)     Additional Matters.    Purchaser shall have received such additional documents, instruments or items of information reasonably requested by it from the Seller in respect of any aspect or consequence of the transactions contemplated hereby.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement or by the other agreements referred to herein shall be reasonably satisfactory in form and substance to Purchaser and its counsel.  No Governmental Authority shall have initiated any investigation of Seller or its conduct, inspection of the Premises, or provided to any party notice (formal or informal) of its intent initiate such investigation or inspection.

7.3     Conditions to the Seller's Obligations.  The obligations of the Seller to consummate the sale of the Acquired Assets contemplated hereunder are subject to the satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by the Seller:

(a)     Accuracy of Representations and Warranties.  All of the representations and warranties set forth in Article V shall be true and correct in all material respects as of the Closing Date.

(b)     Performance of Covenants.  Purchaser shall have performed and complied with in all material respects the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)     Officer's Certificate.   Purchaser shall deliver to the Seller a certificate signed by an executive officer of Purchaser, dated the date of the Closing Date (in form and substance reasonably satisfactory to the Seller), certifying that the conditions specified in Section 7.3 have been satisfied as of the Closing;

(d)     Closing Deliveries.  Purchaser shall have delivered to the Seller the items set forth in Section 3.4.

## ARTICLE VIII
## TERMINATION.

8.1     Termination.  This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written agreement of Purchaser and the Seller;

(b)     by Purchaser or the Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)     by Purchaser or the Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or

20

warranties or a material breach of any of the covenants or agreements set forth in this Agreement on the part of the other party, which, in the case of any such breach that is curable prior to the Closing, is not cured within five (5) days following written notice to the party committing such breach;

(d) by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in <u>Section 7.2</u> has not been and cannot be fulfilled or satisfied on or prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(e) by Purchaser if the Seller (i) seeks or supports Bankruptcy Court approval of an Acquisition Proposal (other than to or by Purchaser) or (ii) executes and delivers an agreement or understanding of any kind with respect to an Acquisition Proposal;

(f) by Purchaser or the Seller if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than the sale of the Acquired Assets to Purchaser);

(g) by Purchaser as a result of (i) the failure of the Bankruptcy Court to enter the Sale Order by no later than the Sale Order Deadline, or (ii) the Sale Order ceasing to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(h) by Purchaser if there has been a default or event of default under any cash collateral or debtor-in-possession financing order;

(i) by the Seller (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in <u>Section 7.3</u> has not been and cannot be fulfilled or satisfied on or prior to the Closing Date;

(j) by the Purchaser if any stay, Order, or event that causes a termination of the Real Estate Sale agreement between RES and Purchaser or the applicable Purchaser Affiliate occurs or the Real Estate Sale agreement is otherwise terminated in accordance with its terms by any party; and

(k) by Purchaser if the Chapter 11 Case is dismissed or converted into one or more cases under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for the Seller and such trustee rejects the transactions contemplated by this Agreement.

8.2     <u>Expense Reimbursement and Breakup Fee</u>.

(a) If this Agreement is terminated prior to the Closing for any reason other than validly by the Seller pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(i)</u>, the Seller shall, concurrently with any such termination by the Seller, and no later than two (2) Business Days following any such termination by Purchaser, immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, an amount equal to

4811-7444-8605

50% of the costs and out-of-pocket expenses incurred by Purchaser in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement up to a maximum of fifteen thousand dollars ($15,000) (the "Expense Reimbursement"). Unless payment of the Expense Reimbursement is timely made in accordance herewith, Seller agrees that it will not accept any Acquisition Proposal that does not cause the liability of the Expense Reimbursement to be satisfied at the closing thereof.

(b)       In addition to any Expense Reimbursement paid pursuant to Section 8.2(a), upon the first to occur of (i) the date Seller consummates a sale of any of the Acquired Assets to an entity other than Purchaser or (ii) the date Seller consummates a plan under the Bankruptcy Code without first selling the Acquired Assets to Purchaser, the Seller shall immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, a breakup fee in an amount equal to seven thousand dollars ($7,000) (the "Breakup Fee"); provided, however, that the Breakup Fee shall not be payable to Purchaser if this Agreement is validly terminated by the Seller pursuant to Section 8.1(c) or Section 8.1(i). Unless payment of Breakup Fee is timely made in accordance herewith, Seller agrees that it will not accept any Acquisition Proposal that does not cause the liability of the Breakup Fee to be satisfied at the closing thereof.

(c)       The parties acknowledge that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement and constitute liquidated damages and not a penalty, and that, without these agreements, Purchaser would not have entered into this Agreement. The obligations of the Seller under this Section 8.2 shall survive any termination or expiration of this Agreement; provided, however, that the Seller shall have no obligation to pay the Expense Reimbursement or the Breakup Fee if this Agreement has been validly terminated by the Seller pursuant to Section 8.1(c) or Section 8.1(i).

8.3       Effect of Termination or Breach. If the transactions contemplated hereby are not consummated and this Agreement is terminated (a) this Agreement shall become null and void and of no further force and effect, except (i) for Section 8.2, (ii) the applicable provisions of Article X, and (iii) that the termination of this Agreement for any reason shall not relieve any party hereto from any Liability which at the time of termination had already accrued to the other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) if this Agreement is terminated for any reason other than validly by the Seller pursuant to Section 8.1(c) or Section 8.1(i), the Seller shall not be entitled to any damages, losses, or payment from Purchaser, and Purchaser shall have no further Liability of any kind to Seller, any of its Affiliates, or any Third Party on account of this Agreement.

**ARTICLE IX**
**POST-CLOSING COVENANTS**

4811-7444-8605

9.1    Certain Consents.  If a consent of a Third Party which is required in order to assign any Acquired Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of the Seller to convey its interest in question to Purchaser, the Seller will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of the Seller in the benefits of such Acquired Asset.  If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, the Seller agree to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

9.2    Name Changes.  On the Closing Date, the Seller shall take all necessary action to change their names and the names of all of their respective Affiliates to one or more names that do not include the words "Grasan" or any other name or mark included in the Acquired Intellectual Property or any translations, adaptations, derivations, variations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "Restricted Names"). The Seller shall promptly notify Purchaser of such name change(s) and the new name(s) chosen by the Seller and all of their respective Affiliates, as applicable.  From and after Closing, except in furtherance of consummation of the Chapter 11 Cases, the Seller and all of their respective Affiliates shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets.

9.3    [Reserved].

9.4    Confidentiality.  Following the Closing, the Seller shall, and shall cause each of their respective Affiliates, and each such Person's respective directors, officers, employees and representatives to, maintain as confidential and not use or disclose (except as required by Law or as authorized in writing by Purchaser) (a) any information or materials relating to the Acquired Assets, or (b) any materials developed by Purchaser or any of its representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel).  Except as otherwise permitted and provided above in this Section 9.4, in the event Seller is required by Law to disclose any such confidential information after the Closing, such Seller shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with Purchaser to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law.  Information subject to the confidentiality obligations in this Section 9.4 does not include any information which (x) at the time of disclosure is generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement or any other confidentiality obligation) or (y) becomes available on a non-confidential basis from a Person who is not known to be bound by a confidentiality agreement or obligation with respect to the disclosed information.

9.5    Taxes.

(a)    On or prior to the Closing, the Seller shall pay all sales taxes, use taxes, and other Taxes owed or owing with respect to the Acquired Assets and attributable to taxable periods or portions thereof prior to the Closing.

4811-7444-8605

(b)     Purchaser and the Seller shall cooperate in providing each other with appropriate resale exemption certification and other similar tax and fee documentation.

(c)     Purchaser and the Seller shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other Proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  All costs and expenses incurred in connection with this Section 9.5(c) shall be borne by the party that is subject to such Proceeding.

(d)     The parties hereto intend that the transactions contemplated by this Agreement be treated for federal income tax and other applicable income tax purposes as a taxable sale of the Acquired Assets by the Seller to Purchaser in exchange for the Purchase Price.  Each of the parties hereto shall prepare and file all applicable income Tax Returns in a manner consistent with the foregoing and none of the parties hereto shall take any position (whether in audits, on Tax Returns or otherwise) that is inconsistent with the foregoing unless required to do so by applicable Law.

9.6     Access.  From and after the Closing, Seller shall preserve intact all Acquired Assets then in its possession or otherwise not yet delivered to Purchaser hereunder, and Seller shall ensure that Purchaser and each of its Affiliates, agents and representatives have full and complete access to each of the Seller's premises and to each other location where any Acquired Assets may be located, in order to allow Purchaser and/or any of its Affiliates, agents and representatives to take possession and delivery of all of the Acquired Assets.


# ARTICLE X
# MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties.     The representations and warranties respectively made by the Seller and Purchaser in this Agreement and in any certificate delivered hereunder will expire as of the Closing.  Subsequent to Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against either party.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

10.2     Expenses.

(a)     Except as otherwise provided herein, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.

(b)     The parties hereto agree that if any claims for commissions, fees or other compensation, including brokerage fees, finder's fees, or commissions are ever asserted against

24

Purchaser or the Seller in connection with the transactions contemplated hereby, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party(ies) entitled to indemnification) and hold the other harmless from and against any and all such claims or demands asserted by any Person in connection with the transaction contemplated hereby.

10.3     <u>Amendment</u>.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Purchaser and Parent.

10.4     <u>Waivers</u>.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Parent, in the case of a waiver by Seller, or Purchaser, in the case of a waiver by Purchaser, and no waiver in any one (1) or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.5     <u>Notices</u>.  All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (a) when personally delivered, (b) when sent by e-mail prior to 5:00 p.m. local time of the recipient on a Business Day (or otherwise on the next Business Day), (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid), or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

|  |  |
|---|---|
| To Seller: | Grasan Equipment Corp.<br>440 South Illinois Avenue<br>Mansfield, Ohio 44907<br>E-mail: eeilenfeld@grasan.com |
| with copy to: | Patrick Carothers<br>LEECH TISHMAN FUSCALADO & LAMPL, LLC<br>525 William Penn Place, 28th Floor<br>Pittsburg, PA 15219<br>E-mail: pcarothers@leechtishman.com |
| To Purchaser: | Terex USA, LLC<br>45 Glover Avenue, 4th Floor<br>Norwalk, CT 06850<br>Attn: Alex Sherman<br>E-mail: alex.sherman@terex.com |
| With copies to: | Thompson Hine LLP<br>10050 Innovation Dr. #400 |

25

Miamisburg, OH 45342
Attn: Jonathan Hawkins
E-mail: jonathan.hawkins@Thompsonhine.com

4811-7444-8605

10.6    Counterparts; Electronic Execution.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in counterparts, all of which shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

10.7    Headings.  The headings preceding the text of the Articles and Sections of this Agreement are for convenience only and shall not be deemed part of this Agreement.

10.8    SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY.  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (I) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (II) THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

10.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Ohio without giving effect to any choice or conflict of Law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Ohio.

4811-7444-8605

10.10    Binding Nature; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties; except (a) that Purchaser may assign any of its rights and obligations hereunder to any of its Affiliates and, following the Closing, in whole or in part to any successor-in-interest or to any Person acquiring all or any portion of the Acquired Assets; provided, however, that Purchaser shall not be relieved of any liability or obligation hereunder; (b) the rights and interests of the Seller hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to the Seller pursuant to a confirmed Chapter 11 plan; and (d) as otherwise provided in this Agreement.  The Seller hereby agree that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and the Seller will sign a consent with respect thereto if so requested by Purchaser or its lenders, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

10.11    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

10.12    Severability.  Each provision of this Agreement is integral and of essence to the Agreement.  If any provision of this Agreement is held to be prohibited by or invalid under applicable Law, or is stricken or revised by any court with jurisdiction over the transactions contemplated by this Agreement, then this Agreement shall be deemed invalid, void and terminated in all respects unless the parties hereto agree otherwise in writing.

10.13    Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.  Whenever a party's consent, approval or satisfaction is required under this Agreement, the decision as to whether or not to consent or approve or be satisfied shall be in the sole and exclusive discretion of such party, and such party's decision shall be final and conclusive.

10.14    Public Announcements.  Except as required by Law or in connection with the Chapter 11 Cases, neither the Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned.  Prior to making any public disclosure required by applicable Law, the disclosing party shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.  Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

4811-7444-8605

10.15  Entire Understanding.  This Agreement, including the Exhibits hereto, sets forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and this Agreement, including the Exhibits hereto, supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof and is not intended to confer upon any other Person any rights or remedies hereunder.

10.16  Closing Actions.  All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

10.17  Conflict Between Transaction Documents.  The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

*[Remainder of Page Intentionally Left Blank]*

4811-7444-8605

This Agreement has been executed by the undersigned on the date first set forth above.

**PURCHASER**

**TEREX USA, LLC**

By: _____
          Scott Posner

Its:    Senior Vice President

**SELLER**

**GRASAN EQUIPMENT CO.**

By: _____

Its:

**<u>Exhibit A</u>**

RESERVED

**Exhibit B**

Form of Sale Order

**IN THE UNTIED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF OHIO**
(*Canton Division*)

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| GRASAN EQUIPMENT COMPANY, | ) | |
| INC., | ) | Case No. _____ |
| | ) | |
| *Debtor.* | ) | |
| | ) | Judge Russ Kendig |
| | ) | |
| _____ | ) | |

**ORDER
AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S ASSETS TO TEREX USA, LLC OR TO THE HIGHEST AND BEST
BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
<u>INTERESTS</u>**

The Court, having held a hearing on [_____], 2021 (the "<u>Sale</u>

<u>Hearing</u>"), on Debtor's Motion for an Order Authorizing the Sale of Substantially All of

Debtor's Assets To Terex USA, LLC or the Highest and Best Bidder, Free and Clear of All

Liens, Claims, Encumbrances, and Interests (the "<u>Sale Motion</u>") filed by the above-captioned

debtor and debtor-in- possession (the "<u>Debtor</u>"), pursuant to which Debtor sought orders,

pursuant sections 105 and 363 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>")

and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy Rules</u>"), the Court having reviewed and considered the Sale Motion and the relief

requested in the Sale Motion and the evidence produced:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

      A.      The findings and conclusions set forth herein and on the record at the Sale

1

Hearing constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Capitalized terms not otherwise defined will be given the meanings given to them in the Sale Motion.

B.      This Court has jurisdiction over the Sale Motion and the transactions contemplated by such Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of this case and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein include, but are not necessarily limited to, sections 105(a) and 363 of the Bankruptcy Code, and Rules 1017, 2002, 6004, 9006, 9007, 9008, 9014 and 9019 of the Bankruptcy Rules.

D.      This Court entered the Order Approving (I) Bidding Procedures for the Sale of Acquired Debtor's Assets Free and Clear of Liens and Encumbrances; (II) Break-Up Fee Related to the Sale of Acquired Debtor's Assets Free and Clear of Lien and Encumbrances; (III) Scheduling an Auction of Debtor's Assets and a Hearing to Consider the Sale of Debtor's Assets; and (IV) Approving the Form and Manner of Notice on [_____], 2021, at Docket _____ (the "Bid Procedures Order").

E.      As no Qualifying Bids, as defined in the Bid Procedures Order, were received by Debtor, the auction scheduled for [_____], 2021 at 10:00 a.m. (the "Auction") was not held. Accordingly, Terex USA, LLC is deemed to be the "Successful Bidder" of Debtor's Assets (the "Purchaser") and may proceed as the Purchaser under the Stalking Horse APA.

F.      Proper notice of the Sale Motion and the transactions contemplated thereby has

2

been provided in accordance with sections 102(1), 105(a), 363 of the Bankruptcy Code and Bankruptcy Rules 2002, and Rule 6004, and in compliance with the Bid Procedures Order; such notice was good, sufficient and appropriate under the circumstances; and no other or further notice of the Sale Motion, the Auction, the Sale Hearing, this Order or the transactions contemplated thereby or hereby is or shall be required.

G. A reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including the following: (i) the Office of the United States Trustee; (ii) all persons and entities known to have expressed an interest in acquiring any of Debtor's Assets; (iii) all known creditors of Debtor, including, but not limited to, the Lienholders; and (iv) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 2002.

H. Debtor may sell Debtor's Assets free and clear of all Liens (as defined in the Stalking Horse APA), with all such Liens being divested from Debtor's Assets and transferred to the proceeds of sale and attaching to the proceeds to the same extent and with the same priority, validity, force and effect as the Liens had against Debtor's Assets immediately prior to the Closing, because each entity with a Lien in any of Debtor's Assets to be transferred on the Closing Date either (i) has consented to the sale or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens who did not timely object to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

3

Code.

I.      Good and sufficient reasons for approval of the Stalking Horse APA and the Sale Motion have been articulated. The relief requested in the Sale Motion is in the best interests of Debtor, its estate, its creditors and other parties in interest.

J.      Debtor has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that, among other things, (a) the proposed consideration for Debtor's Assets constitutes the highest or otherwise best offer for Debtor's Assets, and no other party has offered to purchase Debtor's Assets for a greater economic value to Debtor or its estate; and (b) the Stalking Horse APA and the Closing will present the best opportunity to realize and maximize the value of Debtor's Assets.

K.      The Stalking Horse APA was negotiated, proposed and entered into by Debtor and Purchaser without collusion, in good faith and from arm's-length bargaining positions.

L.      Debtor conducted the sale process in accordance with, and has otherwise complied in all respects with, the Bid Procedures Order.  Debtor (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify and submit a higher or otherwise better offer to purchase Debtor's Assets and 440 S. Illinois Avenue Property, (b) provided potential purchasers sufficient access to materials and information to enable them to make an informed judgment on whether or what to bid on Debtor's Assets and 440 S. Illinois Avenue Property (or any subset thereof), and (c) considered any bids submitted on or before the Bidding Deadline as defined in the Bid Procedures Order.

M.      Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Purchaser will be acting in

4

good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Stalking Horse APA and at all times after the entry of this Order. The Stalking Horse APA and all covenants in and conditions thereto, and any supplementary written agreements or schedules are to be considered an integrated transaction, subject to and protected by section 363(m) of the Bankruptcy Code.

N.      The consideration provided by Purchaser pursuant to the Stalking Horse APA (i) is fair and reasonable, (ii) is the highest and best offer for Debtor's Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States.

O.      The transfer of Debtor's Assets to Purchaser pursuant to the Stalking Horse APA will be a legal, valid, and effective transfer of Debtor's Assets, and vests or will vest Purchaser with all right, title, and interest of Debtor in Debtor's Assets, free and clear of Liens with all such Liens attaching to the proceeds to the same extent and with the same priority, validity, force and effect as the Liens had against Debtor's Assets immediately prior to the Closing.

P.      As of the date of the Closing, neither Purchaser nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of Debtor's Assets: (a) are a successor to Debtor; (b) have, de facto or otherwise, merged with or into Debtor; (c) are a continuation of Debtor or any enterprise of Debtor, or a continuation of any non- debtor affiliate of Debtor or any enterprise of any non-debtor affiliate of Debtor; or (d) are equity security interest holders or owners of any such party.

It is therefore, **HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Sale Motion is GRANTED on the terms and conditions set forth therein and in this Order.

5

2.      Capitalized terms not otherwise defined herein have the meaning given to them in the Sale Motion.

3.      The Stalking Horse APA, and all of the terms and conditions thereof, including, but not limited to, the sale of Debtor's Assets in exchange for the Purchase Price as set forth and further detailed in the Stalking Horse APA, is hereby approved.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, Debtor is authorized to consummate the sale, pursuant to and in accordance with the terms and conditions of the Stalking Horse APA. The consideration provided by the Purchaser for Debtor's Assets under the Stalking Horse APA (a) is and shall be deemed to constitute reasonably equivalent value and fair consideration given to Debtor in exchange for its right, title, and interest in and to Debtor's Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession and (b) is fair and reasonable. Neither the consideration nor the Stalking Horse APA may be avoided under section 363(n) or any other provision of the Bankruptcy Code or applicable non-bankruptcy law.

5.      The Purchaser is found to be a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and shall be entitled to the protections afforded a good faith purchaser pursuant to such section. The Purchaser is not an insider of or affiliated with Debtor, any non-debtor affiliate of Debtor, or any equity security interest holder or owner of any such party. The Purchaser has acted in "good faith" in connection with the sale and, thus, the Purchaser is entitled to the full protections of section 363(m) of the Bankruptcy Code. Consistent therewith, the transactions contemplated by the Stalking Horse APA are being undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code.

6.      Debtor is authorized to execute and deliver, and empowered to perform under, consummate and implement, the Stalking Horse APA and all other additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA, and to take all further actions as may be requested by Purchaser for the purpose of transferring Debtor's Assets to Purchaser or as may be necessary or appropriate to the performance of the obligations contemplated by the Stalking Horse APA. Debtor is further authorized and directed to take all further actions as may be requested by the Purchaser for the purpose of transferring Debtor's Assets or as may be necessary or appropriate to the performance of the obligations contemplated by the Stalking Horse APA, without further order of this Court.

7.      Pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code, Debtor's Assets shall be transferred to Purchaser and, as of the Closing Date, shall be transferred free and clear of all Liens with all such Liens being hereby divested from the property sold and transferred to the proceeds of sale, attaching to the proceeds paid to Debtor by the Purchaser to the same extent and with the same priority, validity, force and effect as the Liens, had against Debtor's Assets immediately prior to the Closing, subject to any rights, claims and defenses Debtor may possess with respect thereto, including but not limited the following Liens:

| No. | Creditor | Collateral |
|-----|----------|------------|
| 1 | Thryve Capital Funding, LLC | All Debtor's Assets |
| 2 | National Funding, Inc. | All Debtor's Assets |
| 3 | Internal Revenue Service | Federal Tax Lien on Debtor's Assets |
| 4 | Ohio Department of Taxation | State Tax Lien on Debtor's Assets |
| 5 | APZB Industries | All Debtor's Assets |
| 6 | CT Corporation System, as representative (2017) | All Debtor's Assets |
| 7 | CT Corporation System, as representative (2018) | All Debtor's Assets |

8.      The transfer of Debtor's Assets to the Purchaser (a) shall constitute a legal, valid,

7

and effective transfer of Debtor's Assets, authorized pursuant to the Bankruptcy Code, and (b) shall vest in the Purchaser all right, title, and interest of Debtor in and to Debtor's Assets, free and clear of all Liens with all such Liens being divested from Debtor's Assets and attaching to the proceeds of sale to the same extent and with the same priority, validity, force and effect as the Liens had against Debtor's Assets immediately prior to the Closing. Except as expressly set forth in the Stalking Horse APA, the Purchaser shall have no liability for any Liens or damages or other obligation of or against Debtor related to Debtor's Assets by reason of the transfer of Debtor's Assets to the Purchaser or by reason of or in connection with Debtor's prior conduct or operation or discontinuation of the business. Without limiting the generality of the foregoing, the Purchaser shall not be liable for any Liens, claims, encumbrances or interests that may be asserted against Debtor or any of its predecessors or affiliates or any insiders of the foregoing, and the Purchaser shall not be liable for any Liens, claims, encumbrances or interests against Debtor including under any theory of antitrust, environmental, successor or transferee liability, labor law, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including liabilities on account of warranties, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation or discontinuation of Debtor's business or the use, disposition, or operation of Debtor's Assets prior to the Closing.

9. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens, claims or interests in or on Debtor's Assets shall not have delivered to Debtor prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of

8

satisfaction, and releases of all Liens that the person or entity has with respect to Debtor's Assets, (a) Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to Debtor's Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, claims and interests against, in, or on Debtor's Assets of any kind or nature whatsoever; *provided, however*, that nothing in this paragraph shall operate to impair the free and clear transfer of Debtor's Assets authorized by this Order generally or otherwise require Debtor or the Purchaser to obtain or file any such termination statements, satisfactions, or releases.

10.     All persons and entities, including, but not limited to, all equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding Liens, claims and/or interests of any kind or nature whatsoever against or in Debtor or Debtor's Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, Debtor, Debtor's Assets, the operation or closing of the businesses by Debtor or the free and clear transfer of Debtor's Assets to Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against Purchaser, its property, its successors and assigns, its affiliates or Debtor's Assets, such persons' or entities' Liens with all such Liens attaching to the proceeds to the same extent and with the same priority, validity, force and effect as the Liens had against Debtor's Assets immediately prior to the Closing. Following the Closing Date, no holder of a Lien against or in Debtor shall interfere with Purchaser's title to or use and enjoyment of

9

Debtor's Assets based on or related to such Liens.

11.     The transfer of Debtor's Assets to Purchaser pursuant to the Stalking Horse APA constitutes a legal, valid and effective transfer of Debtor's Assets, and shall vest Purchaser with all right, title and interest of Debtor in and to Debtor's Assets free and clear of all Liens with all such Liens, claims, encumbrances and interests attaching to the proceeds of sale to the same extent and with the same priority, validity, force and effect as the Liens had against Debtor's Assets immediately prior to the Closing. The failure specifically to include any particular provisions of the Stalking Horse APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse APA be authorized and approved in its entirety.

12.     This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of Debtor's Assets.

13.     All persons or entities who are presently, or on the closing may be, in possession of any of Debtor's Assets are hereby directed to surrender possession of Debtor's Assets to the Purchaser.

14.     The Stalking Horse APA and the transactions and instruments contemplated thereby shall be enforceable against and binding upon and shall not be subject to rejection or avoidance by Debtor or any chapter 7 or chapter 11 trustee for Debtor or its estate or any other

10

person or entity on behalf of Debtor. Furthermore, nothing contained in any chapter 11 plan confirmed in this chapter 11 case or any order of the Court confirming such plan(s) or any other order entered in this chapter 11 case (or any subsequent chapter 7 case(s)) shall conflict with or derogate from the provisions of the Stalking Horse APA or the terms of this Order.

15.     Nothing in this Order is intended to or shall be deemed to modify the terms of the Stalking Horse APA except as may be expressly provided herein.

16.     The Stalking Horse APA may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement is not material. The terms and provisions of this Order shall inure to the benefit of and shall be fully enforceable by Purchaser's successors and assigns.

17.     To the extent that Section 1146(c) of the Bankruptcy Code applies, the sale of Debtor's Assets to the Purchaser shall be exempt from any and all stamp, transfer, recording, and other similar taxes (other than income taxes), and any transfer fees or other similar costs incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) in connection with the sale or transfer of Debtor's Assets to Purchaser or the transactions contemplated by the Stalking Horse APA.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Stalking Horse APA.

18.     Except as otherwise provided by further order of this Court, this Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Stalking Horse APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Debtor is a party or which has been assigned by Debtor to the Purchaser in accordance

11

with the Stalking Horse APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Stalking Horse APA, including retaining jurisdiction to (a) compel delivery of Debtor's Assets in accordance with the Stalking Horse APA; (b) interpret, implement and enforce the provisions of this Sale Order; and (c) protect Purchaser against any Liens, Claims, Encumbrances and Interests in or against Debtor or Debtor's Assets of any kind or nature whatsoever, attaching to the proceeds of the sale under the Stalking Horse APA.

19.    This Order is a final order and, in accordance with Bankruptcy Rule 8002(a), the time to file a notice of appeal of this Order shall commence on the date of the entry of this Order by the Court. Pursuant to Bankruptcy Rule 6004(h), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs that the fourteen-day stay otherwise applicable pursuant to Rule 6004(h) may be waived by agreement of the parties to the Stalking Horse APA.

20.    This Order survives any dismissal or conversion of the within case.

# # #

**SUBMITTED BY:**

 */s/*_____
Patrick W. Carothers, Esq.
Leech Tishman Fuscaldo & Lampl LLC

*Counsel to Debtor and*
*Debtors-in-Possession*

## **Exhibit C**

Form of Bill of Sale

## BILL OF SALE

This BILL OF SALE ("Bill of Sale"), dated as of the ___ day of _____, 2021, is made between by and between Grasan Equipment Co., an Ohio corporation ("Seller"), and Terex USA, LLC a Delaware limited liability company ("Purchaser").

A.      Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of February 18, 2021 (the "Purchase Agreement"), pursuant to which, among other things, Seller has agreed to sell and Purchaser has agreed to purchase the Acquired Assets. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

B.      Seller has agreed to execute and deliver this Bill of Sale to Purchaser for the purpose of transferring to and vesting in Purchaser title to the Acquired Assets as set forth herein.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Seller hereby sells, conveys, transfers, assigns, delivers and vests in Purchaser, its successors and assigns forever, all of Seller's right, title and interest in and to the Acquired Assets pursuant to and in accordance with the terms and conditions of the Purchase Agreement. Purchaser hereby purchases, acquires and accepts the Acquired Assets pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

2.      Seller hereby constitutes and appoints Purchaser, its successors and assigns, as Seller's true and lawful attorney, with full power of substitution, in Seller's name and stead, on behalf of and for the benefit of Purchaser, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in Seller's name, at the sole expense and for the benefit of Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Purchaser, its successors and assigns, reasonably may require for the collection or reduction to possession of any of the Acquired Assets.

3.      Seller hereby covenants that, from time to time after the delivery of this instrument, at Purchaser's request, Seller will do, execute, acknowledge and deliver, or will use commercially reasonable efforts to cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Purchaser may reasonably require to convey, transfer to and vest in Purchaser, and to put Purchaser in possession of, any of the Acquired Assets.

4.      Nothing in this Bill of Sale shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement or any liability or obligation of Seller or Purchaser arising under the Purchase Agreement, which shall govern the representations, warranties and obligations of the

parties with respect to the Acquired Assets. In the event of any conflict between the Purchase Agreement and this Bill of Sale, the provisions of the Purchase Agreement shall control.

5. This Bill of Sale will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

6. This Bill of Sale shall be governed by and construed in accordance with the laws of the state of Ohio applicable to contracts made and performed in such state, without giving effect to its choice of law or conflict of law rules.

7. This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. A facsimile, PDF or other electronic signature of this Bill of Sale shall be valid and have the same force and effect as a manually signed original.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the date first written above.

**PURCHASER**

**TEREX USA, LLC**


By:_____
       Scott Posner
Its:    Senior Vice President


**SELLER**

**GRASAN EQUIPMENT CO.**


By:_____

Its:

**<u>Exhibit D</u>**

Form of Intellectual Property Assignment

# **INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT ("IP Assignment"), is made and entered into as of _____, 2021 by and between Grasan Equipment Co., an Ohio corporation ("Seller"), and Terex USA, LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of February 19, 2021 (the "Purchase Agreement"), pursuant to which, among other things, Seller has agreed to sell and Purchaser has agreed to purchase the Acquired Assets. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, under the terms of the Purchase Agreement, Seller has conveyed, transferred, and assigned to Purchaser, included in the Acquired Assets, certain intellectual property of Seller, and has agreed to execute and deliver this IP Assignment.  As used in this IP Assignment, "Intellectual Property" shall mean and include all intellectual property rights, industrial property rights or other similar proprietary rights in any country or jurisdiction, including such rights in and to:  (a) Patents; (b) Trade Secrets; (c) copyrights; (d) trademarks and service marks; (e) designs; and (f) inventions, know-how, discoveries, data, databases, market research information, software, algorithms, and improvements thereto. As used herein, "Patents" means and includes all United States, foreign and international issued patents, and other patent rights including, without limitation, design and utility patents, utility models, industrial designs, divisionals, continuations, continuations-in-part, reexaminations, reissues, and extensions thereof, and the inventions disclosed or claimed therein, and any improvements thereon, and any application or patent claiming priority thereto or therefrom, in each case including all applications therefor. "Trade Secrets" means and includes all trade secrets and confidential, non-public or proprietary business information including ideas, formulas, formulations, compositions, technical documentation, operating manuals and guides, plans, designs, sketches, equipment lists, engineering reports and drawings, computer systems and software, manufacturing and production processes and techniques, drawings, specifications, proposals, research records, invention records, inventors' notes, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists, licensing records, advertising and promotional materials, service and parts records, and all other know-how.

NOW THEREFORE, Seller agrees/the parties agree as follows:

1.      Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby irrevocably conveys, transfers, and assigns to Purchaser, and Purchaser hereby accepts, all of Seller's right, title, and interest in and to any and all Intellectual Property owned by Seller, along with all income, royalties, damages and payments due or payable to Seller as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that,

now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Seller's possession or control (the "Assigned IP").

2.     Recordation and Further Actions. Seller shall take such steps and actions, and provide such cooperation and assistance to Purchaser and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned IP to Purchaser, or any assignee or successor thereto.

3.     Terms of the Asset Purchase Agreement. The parties hereto acknowledge and agree that this IP Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Purchaser with respect to the Assigned IP. The representations, warranties, covenants, agreements, and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4.     Counterparts. This IP Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

5.     Successors and Assigns. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.     Governing Law. This IP Assignment shall be governed by and construed in accordance with the laws of the state of Ohio applicable to contracts made and performed in such state, without giving effect to its choice of law or conflict of law rules.

7.     Seller's Covenant.  Seller hereby covenants that it has full and complete authority to make this IP Assignment upon the closing under the Purchase Agreement, and that no assignment, sale, agreement, or encumbrance has been or will be made or entered into which would conflict with this IP Assignment.

*[Remainder of Page Intentionally Left Blank]*

2

IN WITNESS WHEREOF, the parties have executed this IP Assignment as of the date first written above.

**PURCHASER**

**TEREX USA, LLC**


By:_____
       Scott Posner
Its:    Senior Vice President


**SELLER**

**GRASAN EQUIPMENT CO.**


By:_____

Its:

3

## Schedule 2.1

Certain Tangible Acquired Assets

**Asset List - February 2021 (Grasan Equipment Company, Inc.)**

| No. | Category | Description | Date in Service |
|---|---|---|---|
| 1 | Vehicular | 2011 Jeep SUV | 12/13/2013 |
| 2 | Vehicular | 42' Fruehauf Trailer | 6/1/1978 |
| 3 | Vehicular | 78 Mack Yard Truck | 4/20/1999 |
| 4 | Vehicular | 2007 Kenworth 1375 | 11/8/2006 |
| 5 | Equipment | Monarch Welder | 8/1/1974 |
| 6 | Equipment | Wiring Cranes | 11/1/1975 |
| 7 | Equipment | Parts Bin | 12/1/1975 |
| 8 | Equipment | Scale | 12/1/1975 |
| 9 | Equipment | 10 Ton Crane | 1/1/1976 |
| 10 | Equipment | Hoist I Trolley | 2/1/1976 |
| 11 | Equipment | Welder & Auto Feed | 2/1/1976 |
| 12 | Equipment | Scaffolding | 3/1/1976 |
| 13 | Equipment | Turret Lathe | 3/1/1976 |
| 14 | Equipment | Cranes-Shop | 6/1/1976 |
| 15 | Equipment | Clousing Drill | 6/1/1976 |
| 16 | Equipment | Ram 3-Ton Crane | 6/1/1976 |
| 17 | Equipment | Power Press Brake | 6/1/1976 |
| 18 | Equipment | Overhead Crane | 6/1/1976 |
| 19 | Equipment | Welder S/N 77 Wad | 10/1/1977 |
| 20 | Equipment | 3 Ton Elec. Hoists | 3/1/1978 |
| 21 | Equipment | Crane | 3/1/1978 |
| 22 | Equipment | 3 Hoists-3 Trolleys | 8/1/1978 |
| 23 | Equipment | Refrigerator Manual | 9/1/1978 |
| 24 | Equipment | Wiring Bridges For | 9/1/1978 |
| 25 | Equipment | 20in Wilton Press | 2/1/1979 |
| 26 | Equipment | 2 Mig Welders | 6/1/1979 |
| 27 | Equipment | Acetylene Welding | 6/1/1979 |
| 28 | Equipment | Wissong 36in Power | 6/1/1979 |
| 29 | Equipment | Welding Gun | 7/1/1979 |
| 30 | Equipment | Hyster Forklift | 7/1/1979 |
| 31 | Equipment | 2 - 1/2 Ton Electric | 7/1/1979 |
| 32 | Equipment | 2 Welders | 7/1/1979 |
| 33 | Equipment | Overhead Door | 9/1/1979 |
| 34 | Equipment | Two Welders | 3/1/1980 |
| 35 | Equipment | Lincoln Weld Gun | 8/1/1982 |
| 36 | Equipment | Lincoln Undercarrig | 11/1/1983 |
| 37 | Equipment | Transit Acrs 30895 | 8/1/1984 |
| 38 | Equipment | Miller Welder | 12/1/1984 |
| 39 | Equipment | Hydralic Punch | 7/1/1985 |
| 40 | Equipment | Harris Cutting | 1/1/1986 |
| 41 | Equipment | Bins And Cabinet | 1/1/1986 |
| 42 | Equipment | Hyster Fork Lift | 7/1/1986 |

| 43 | Equipment | 1/2 Ton Electric | 2/10/1987 |
|---|---|---|---|
| 44 | Equipment | Ironworker | 4/25/1987 |
| 45 | Equipment | Wng 12964 Oilless | 5/5/1987 |
| 46 | Equipment | Pace Hydrlic Press | 9/23/1987 |
| 47 | Equipment | Yale Hoist | 5/25/1988 |
| 48 | Equipment | Torch & Cylinders | 6/29/1988 |
| 49 | Equipment | 6-Welders & Feeders | 7/25/1988 |
| 50 | Equipment | Scales & Welders | 12/3/1988 |
| 51 | Equipment | Welders Clamps & E | 4/6/1989 |
| 52 | Equipment | Welding Guns Cables | 6/30/1989 |
| 53 | Equipment | Lunchroom Chairs | 7/31/1989 |
| 54 | Equipment | Hydralic Punch | 8/31/1989 |
| 55 | Equipment | Shear Notching Blad | 1/31/1990 |
| 56 | Equipment | Industrial Cutter | 6/22/1990 |
| 57 | Equipment | Wilton C-2 Vise | 1/10/1991 |
| 58 | Equipment | Welding Torch | 4/25/1991 |
| 59 | Equipment | Hydraulic Punch-2 | 7/14/1991 |
| 60 | Equipment | Heater-Paint Strge | 11/10/1991 |
| 61 | Equipment | Vise-M7882X | 12/25/1991 |
| 62 | Equipment | Plasma Burner | 1/31/1992 |
| 63 | Equipment | Control Panel | 1/31/1992 |
| 64 | Equipment | 3 Volt Contactor | 1/31/1992 |
| 65 | Equipment | Water Table | 1/31/1992 |
| 66 | Equipment | Pads-Water Table | 1/31/1992 |
| 67 | Equipment | Paint-Water Table | 1/31/1992 |
| 68 | Equipment | Drives-Water Table | 1/31/1992 |
| 69 | Equipment | 1/2 Ton Lift | 3/10/1992 |
| 70 | Equipment | Vise-M1008X | 3/25/1992 |
| 71 | Equipment | Lincoln Weld Gun | 5/10/1992 |
| 72 | Equipment | Air Grinder | 5/10/1992 |
| 73 | Equipment | Scissors Lift | 5/31/1992 |
| 74 | Equipment | Welders-2 | 5/31/1992 |
| 75 | Equipment | Welder - (U) | 5/31/1992 |
| 76 | Equipment | Pipe Threader | 5/31/1992 |
| 77 | Equipment | Torch Assembly | 7/10/1992 |
| 78 | Equipment | Welder Equipment | 7/10/1992 |
| 79 | Equipment | Crane Wheels-14 | 7/25/1992 |
| 80 | Equipment | Rotary Overhead Lift | 9/21/1992 |
| 81 | Equipment | Used Grinder & Weld | 4/30/1993 |
| 82 | Equipment | Magnetic Drill | 7/25/1993 |
| 83 | Equipment | 2 New Air Grinders | 6/30/1994 |
| 84 | Equipment | 3 Hobart Welders £ | 1/16/1995 |
| 85 | Equipment | Lunchroom Microwave | 1/31/1995 |
| 86 | Equipment | Air Comp Refrig Unit | 6/7/1995 |
| 87 | Equipment | Welding Torch | 10/23/1995 |
| 88 | Equipment | Beams For Crane | 10/23/1995 |
| 89 | Equipment | Crane Hoists/Trolle | 10/31/1995 |

21-60199-rk    Doc 4-2    FILED 02/19/21    ENTERED 02/19/21 20:44:26    Page 59 of 67

| 90 | Equipment | Crane Coupling/Chai | 11/3/1995 |
|---|---|---|---|
| 91 | Equipment | Adjustable Trolley | 11/3/1995 |
| 92 | Equipment | Crane Grab Hooks | 11/7/1995 |
| 93 | Equipment | Crane Parts | 1/31/1996 |
| 94 | Equipment | Fabstar 4030 Welder | 2/29/1996 |
| 95 | Equipment | Crane Sling Hook | 3/5/1996 |
| 96 | Equipment | #1321 Reversing Drive | 10/14/1996 |
| 97 | Equipment | 2 Flatbed Storage T | 10/31/1996 |
| 98 | Equipment | Hystler Forklift | 10/31/1996 |
| 99 | Equipment | Mig Gun Kk415 | 11/5/1996 |
| 100 | Equipment | New Engine - Forklift | 11/13/1996 |
| 101 | Equipment | Cat Loader Sn D3D99 | 11/30/1996 |
| 102 | Equipment | Flatbed Storage Tra | 1/31/1997 |
| 103 | Equipment | 6 400 Amp Guns | 2/14/1997 |
| 104 | Equipment | Cat Loader Improvem | 2/28/1997 |
| 105 | Equipment | Behringer Saw | 2/28/1997 |
| 106 | Equipment | 6' Forklift Forks | 2/28/1997 |
| 107 | Equipment | Cat Loader Improvement | 3/31/1997 |
| 108 | Equipment | Forklift Improvement | 4/28/1997 |
| 109 | Equipment | Shop Microwave | 4/29/1997 |
| 110 | Equipment | Fabstar Welder 4030 | 5/27/1997 |
| 111 | Equipment | Jlp 15' Lift Puller | 6/12/1997 |
| 112 | Equipment | Haberle Saw | 6/30/1997 |
| 113 | Equipment | 2 Fans | 7/15/1997 |
| 114 | Equipment | 2 Cobalt Cutters | 9/30/1997 |
| 115 | Equipment | 6 400 Amp Guns | 11/11/1997 |
| 116 | Equipment | 500 Amp Mig Gun | 11/11/1997 |
| 117 | Equipment | Arcair Torch Assemb | 11/19/1997 |
| 118 | Equipment | Hobart Fabstar Weld | 12/9/1997 |
| 119 | Equipment | Genie Aerial Lift | 12/26/1997 |
| 120 | Equipment | Lunchroom Tables | 6/1/1998 |
| 121 | Equipment | Shelving | 6/30/1998 |
| 122 | Equipment | Shop Shelves | 10/31/1998 |
| 123 | Equipment | Northern 4000Psi Po | 11/25/1998 |
| 124 | Equipment | Forklift Sn Icm0046 | 12/25/1998 |
| 125 | Equipment | Forklift Sn Inf0033 | 11/25/1998 |
| 126 | Equipment | Taylor Forklift | 12/16/1998 |
| 127 | Equipment | Taylor Forklift Imp | 1/18/1999 |
| 128 | Equipment | (4) Lincoln Welders | 1/19/1999 |
| 129 | Equipment | Glass For Forklift | 3/6/1999 |
| 130 | Equipment | Grader Scarifier | 4/16/1999 |
| 131 | Equipment | Table For Saw | 5/4/1999 |
| 132 | Equipment | Roller Table | 5/8/1999 |
| 133 | Equipment | Shop Shelves | 6/17/1999 |
| 134 | Equipment | Gas Pump | 9/8/1999 |
| 135 | Equipment | Shop Shelves | 1/8/2000 |
| 136 | Equipment | 2 Port Mag Drills | 6/12/2000 |

3

| 137 | Equipment | Fiberglass Step Lad | 7/1/2000 |
|---|---|---|---|
| 138 | Equipment | Hyster Forklift | 7/11/2000 |
| 139 | Equipment | Shop Storage Cabinet | 10/19/2000 |
| 140 | Equipment | Shop Heater | 10/23/2000 |
| 141 | Equipment | Metal Chop Saw | 11/18/2000 |
| 142 | Equipment | Hobart 2400 Welder | 11/18/2000 |
| 143 | Equipment | Hobart 450 Mega Mig | 11/18/2000 |
| 144 | Equipment | Jib Crane | 12/15/2000 |
| 145 | Equipment | Chain For Hoist-Ing | 12/18/2000 |
| 146 | Equipment | Hobart Feed Head | 1/15/2001 |
| 147 | Equipment | 3 Ton Electric Hois | 2/8/2001 |
| 148 | Equipment | 2 - Air Pumps | 2/17/2001 |
| 149 | Equipment | Air Compressor | 3/8/2001 |
| 150 | Equipment | Welder Power Unit | 3/9/2001 |
| 151 | Equipment | Welder Feeder | 3/14/2001 |
| 152 | Equipment | Drill Set | 3/20/2001 |
| 153 | Equipment | Comb. Vise W/ Swive | 3/20/2001 |
| 154 | Equipment | Steel Wall Cabinet | 3/20/2001 |
| 155 | Equipment | Storage Cabinets | 4/4/2001 |
| 156 | Equipment | Wardrobe Cabinet | 4/12/2001 |
| 157 | Equipment | Workstation | 4/30/2001 |
| 158 | Equipment | Workstation | 4/30/2001 |
| 159 | Equipment | 3 - 72X30 Benches | 4/30/2001 |
| 160 | Equipment | 2 - Drawer Inserts | 4/30/2001 |
| 161 | Equipment | 3 - Hose Reels | 4/30/2001 |
| 162 | Equipment | Manual Lift Scissor | 5/15/2001 |
| 163 | Equipment | Welder Regulator | 5/16/2001 |
| 164 | Equipment | Upright Sweeper | 7/7/2001 |
| 165 | Equipment | Battery Charger - H | 7/27/2001 |
| 166 | Equipment | Komatsu Fork Lift S | 11/29/2001 |
| 167 | Equipment | Cat Fork Lift Sn | 11/29/2001 |
| 168 | Equipment | Forklift Forks | 12/17/2001 |
| 169 | Equipment | Shop Desk | 2/14/2002 |
| 170 | Equipment | Mig Gun | 4/16/2002 |
| 171 | Equipment | Linatex Sprayer Equ | 10/5/2002 |
| 172 | Equipment | Side Lock Magnetic | 4/18/2005 |
| 173 | Equipment | New Welder Fittings | 3/7/2006 |
| 174 | Equipment | New Welders | 3/16/2006 |
| 175 | Equipment | Band Saw | 3/31/2006 |
| 176 | Equipment | Drill Line | 3/31/2006 |
| 177 | Equipment | Drill Line Installs | 3/31/2006 |
| 178 | Equipment | Plasma Burner Upgra | 3/31/2006 |
| 179 | Equipment | Burner Upgrade Inst | 3/31/2006 |
| 180 | Equipment | Burner Table Rework | 3/31/2006 |
| 181 | Equipment | Air Compressor | 3/31/2006 |
| 182 | Equipment | Drill Line Inserts | 4/7/2006 |
| 183 | Equipment | Drill Line Cabinets | 4/13/2006 |

4

| 184 | Equipment | Mig Gun | 4/20/2006 |
|---|---|---|---|
| 185 | Equipment | Hypro Indicators | 4/21/2006 |
| 186 | Equipment | Welders Swivel Plat | 4/30/2006 |
| 187 | Equipment | Drill Line Parts | 5/10/2006 |
| 188 | Equipment | Chain Hoist & Chain | 5/11/2006 |
| 189 | Equipment | Drill Line Holders | 5/11/2006 |
| 190 | Equipment | Drill Line Cabinets | 5/12/2006 |
| 191 | Equipment | Burn Table Parts | 5/23/2006 |
| 192 | Equipment | Graco Paint Guns | 5/30/2006 |
| 193 | Equipment | Drill Line Parts | 6/1/2006 |
| 194 | Equipment | Angle Line | 6/22/2006 |
| 195 | Equipment | Angle Line Installs | 6/22/2006 |
| 196 | Equipment | Mig Guns | 7/10/2006 |
| 197 | Equipment | Angle Line Tool Box | 7/13/2006 |
| 198 | Equipment | Angle Line Tools | 7/13/2006 |
| 199 | Equipment | Drill Line Inserts | 8/7/2006 |
| 200 | Equipment | Angle Line Upgrade | 8/15/2006 |
| 201 | Equipment | Drill Line Holder | 8/23/2006 |
| 202 | Equipment | Plasma Burner Upgra | 9/8/2006 |
| 203 | Equipment | Paint Guns & Mixer | 9/20/2006 |
| 204 | Equipment | Hytorc Wrench | 11/1/2006 |
| 205 | Equipment | Hammer Drill & Impa | 11/1/2006 |
| 206 | Equipment | Paint Room Equipment | 12/4/2006 |
| 207 | Equipment | Cat Forklift Improv | 12/22/2006 |
| 208 | Equipment | Reversing Drill | 2/1/2007 |
| 209 | Equipment | Air Compressor | 4/19/2007 |
| 210 | Equipment | Air Comp Electric L | 5/24/2007 |
| 211 | Equipment | 2 Pedastal Fans | 8/9/2007 |
| 212 | Equipment | 3 Welders | 9/20/2007 |
| 213 | Equipment | Atlantic Hydraulic | 10/5/2007 |
| 214 | Equipment | 25 Ton Crane | 4/30/2008 |
| 215 | Equipment | Heater/Paint Room | 2/24/2010 |
| 216 | Equipment | Heater/Paint Room | 4/1/2010 |
| 217 | Equipment | Scan Head | 9/9/2010 |
| 218 | Equipment | Ironworker-New Cpu | 7/19/2013 |
| 219 | Equipment | Magnetic Drill | 11/14/2013 |
| 220 | Equipment | 1/2 Ton 3 Phase Lif | 11/14/2013 |
| 221 | Equipment | New Punches for Ironworker | 12/3/2013 |
| 222 | Equipment | Jig for Wide Conveyor | 6/30/2015 |
| 223 | Office | Metal Desk | 8/1/1970 |
| 224 | Office | File Cabinet | 8/1/1970 |
| 225 | Office | Office Furniture | 9/1/1972 |
| 226 | Office | Blueprint Cabinet | 6/1/1974 |
| 227 | Office | Typing Desk | 5/1/1978 |
| 228 | Office | 2-Drawer Filing | 11/1/1979 |
| 229 | Office | Gen. Office Furniture | 1/1/1980 |
| 230 | Office | Bookcase | 2/1/1980 |

21-60199-rk   Doc 4-2   FILED 02/19/21   ENTERED 02/19/21 20:44:26   Page 62 of 67

| 231 | Office | Bookcase | 11/1/1983 |
|---|---|---|---|
| 232 | Office | Drawing Table | 12/1/1984 |
| 233 | Office | Engineering Bookcase | 1/1/1985 |
| 234 | Office | Used Desks | 5/1/1986 |
| 235 | Office | Telephone System | 7/27/1987 |
| 236 | Office | Computer Desk & Chair | 8/29/1987 |
| 237 | Office | File Cabinets | 7/31/1988 |
| 238 | Office | Office Furniture | 12/5/1988 |
| 239 | Office | Office Furniture & Chairs | 2/10/1989 |
| 240 | Office | Computer Table | 5/10/1989 |
| 241 | Office | Video Screen Case | 1/10/1990 |
| 242 | Office | Time Clock | 1/10/1990 |
| 243 | Office | Office Furniture | 10/31/1990 |
| 244 | Office | 2 Office Chairs | 12/10/1990 |
| 245 | Office | Office Chair | 1/31/1993 |
| 246 | Office | Used Office Furniture | 4/30/1993 |
| 247 | Office | Reception Area Desk | 5/11/1995 |
| 248 | Office | Keyboard Style Desk | 5/16/1995 |
| 249 | Office | Engineering Files | 5/31/1995 |
| 250 | Office | Safe & Transformers | 5/31/1995 |
| 251 | Office | Computel Comptr Hardware | 8/12/1996 |
| 252 | Office | Computel Comptr Software | 8/12/1996 |
| 253 | Office | Office Coffee Machine | 9/9/1996 |
| 254 | Office | High Back Chair | 10/14/1996 |
| 255 | Office | Tims Chair | 10/17/1996 |
| 256 | Office | Additional Payment | 10/31/1996 |
| 257 | Office | Bookcase - Matt's Office | 4/30/1997 |
| 258 | Office | Modular Eng Cubicle | 4/17/1998 |
| 259 | Office | Office Tables | 6/8/1998 |
| 260 | Office | Refinish Conf Room | 6/11/1998 |
| 261 | Office | 6 - 5 Drwr Flat File | 6/19/1998 |
| 262 | Office | 4 - 4 Dwr File Cabinet | 6/27/1998 |
| 263 | Office | Fax Machine Finlay | 7/7/1998 |
| 264 | Office | Verticle Blinds Office | 7/9/1998 |
| 265 | Office | 4 Files | 7/13/1998 |
| 266 | Office | Glass Conf Room Table | 7/16/1998 |
| 267 | Office | Computer Internet | 7/20/1998 |
| 268 | Office | 6 - 6X6 Colorstar Ma | 7/30/1998 |
| 269 | Office | 4 - 3X10 Colorstar Ma | 7/20/1998 |
| 270 | Office | Table Top - Chuck | 9/4/1998 |
| 271 | Office | Conf Room Small Table | 9/4/1998 |
| 272 | Office | Addl Cost - Credenza | 10/16/1998 |
| 273 | Office | New Telephone System | 10/30/1998 |
| 274 | Office | Conf Room Credenza | 11/25/1998 |
| 275 | Office | Conf Room Vcr | 11/30/1998 |
| 276 | Office | 5 Filing Cabinets | 9/1/2000 |
| 277 | Office | Nikon | 4/20/2001 |

| 278 | Office | Sams-Digital Camera | 4/25/2001 |
|------|--------|---------------------|-----------|
| 279 | Office | Pedestal Desk | 5/12/2001 |
| 280 | Office | Pedestal Desk w/Lock | 5/12/2001 |
| 281 | Office | New Telephone | 5/19/2001 |
| 282 | Office | Phone Control Center | 8/30/2005 |
| 283 | Office | Dell Computer-Howard | 1/24/2006 |
| 284 | Office | Autodesk Software-H | 1/24/2006 |
| 285 | Office | Dell Cad Computer | 2/7/2006 |
| 286 | Office | Dell Cad Computer | 2/7/2006 |
| 287 | Office | Dell Cad Computer | 2/7/2006 |
| 288 | Office | Dell Cad Computer | 2/7/2006 |
| 289 | Office | Draftsman Chair | 5/8/2006 |
| 290 | Office | Phone Line | 5/10/2006 |
| 291 | Office | Plotter-Engineering | 6/24/2006 |
| 292 | Office | Autocad Computer-St | 6/27/2006 |
| 293 | Office | RISA Engineering Software | 8/24/2006 |
| 294 | Office | Dell Server | 10/15/2006 |
| 295 | Office | Dell Engineering Computer | 2/28/2007 |
| 296 | Office | Dell Engineering Computer | 2/28/2007 |
| 297 | Office | Dell Engineering Laptop | 2/28/2007 |
| 298 | Office | Dell Monitor - Ferguson | 8/28/2007 |
| 299 | Office | Office Bundle - Engineering | 8/28/2007 |
| 300 | Office | Dell Computer - Engineering | 8/28/2007 |
| 301 | Office | Dell Computer | 10/1/2007 |
| 302 | Office | Dell Computer | 12/10/2007 |
| 303 | Office | Solid Works Software | 12/10/2007 |
| 304 | Office | Engineering Software | 4/1/2010 |
| 305 | Office | Engineering Printer | 7/1/2013 |
| 306 | Office | Computers | 12/24/2013 |
| 307 | Office | Computer | 1/21/2015 |
| 308 | Office | Server | 1/24/2015 |
| 309 | Office | Computers | 1/28/2015 |
| 310 | Office | Imaginit Engineering Software | 2/21/2017 |
| 311 | Office | 2 Computer - Microcenter | 5/13/2017 |
| 312 | Office | Imaginit Software Training | 5/30/2017 |
| 313 | Office | Computer - Seitz Solutions | 8/29/2017 |
| 314 | Office | Computer - Seitz | 2/9/2018 |
| 315 | Office | Computer - Seitz | 2/9/2018 |
| 316 | Office | Imaginit Software | 4/1/2018 |

| | | | |
|---|---|---|---|
| 317 | Intellectual Property | Any intellectual property, along with all income, royalties, damages and payments due or payable to company, to the extent it exists, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof including all copies and tangible embodiments of any such inellectual property in company's possession or control. | - |
| 318 | Books and Records | Books and records of company together with all advertising, marketing and promotional materials and all other printed or written materials. | - |

8

## Schedule 4.5(a)

Environmental Permits

## Schedule 4.5(d)

Hazardous Substance Storage Areas