# EXHIBIT "C"

# REAL ESTATE PURCHASE AGREEMENT

THIS REAL ESTATE PURCHASE AGREEMENT (this "Agreement") is made as of February 18, 2021 (the "date of this Agreement") between 440 S. ILLINOIS LIMITED PARTNERSHIP, an Ohio limited partnership] ("Seller"), whose address is 440 South Illinois Avenue, Mansfield, Ohio 44907, and TEREX USA, LLC, a Delaware limited liability company ("Purchaser"), whose address is 45 Glover Avenue, 4th Floor, Norwalk, Connecticut 06850, or its assignee as permitted under Section 14 of this Agreement.

SECTION 1.  DESCRIPTION OF PROPERTY; AGREEMENT OF PURCHASE AND SALE.

1.1  Purchase and Sale; Property.  Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and pay for, upon the terms and conditions contained in this Agreement, the following:

1.1.1  The parcel(s) of land located at 440 South Illinois Avenue, Mansfield, Ohio 44907, as described in Exhibit A (the "Land");

1.1.2  The industrial building containing approximately 57,000 square feet, the office building containing approximately 4,800 square feet, all heating, ventilating and air conditioning equipment and systems, plumbing and electrical equipment and systems, sprinkler systems and other fixtures in the buildings, and all other buildings, structures, landscaping and other improvements on the land (the "Improvements," the Land and the Improvements, collectively, the "Real Property");

1.1.3  All equipment, machinery, furnishings, furniture, alarm systems and all other personal property owned by Seller and attached to, appurtenant to or located on or used in connection with the operation, management or maintenance of the Real Property (collectively, the "Personal Property");

1.1.4  All right, title and interest of Seller in and to easements, rights-of-way, air rights, riparian rights, rights of ingress or egress, and all other rights, privileges and appurtenances owned by Seller and in any way related to, or used in connection with, the Real Property and/or the Improvements.

The term "Property," as used in this Agreement, shall mean all property, whether real or personal, set out in this Section 1.1.

SECTION 2.  PURCHASE PRICE.

2.1  Purchase Price.  The total purchase price for the Property shall be Nine Hundred Fifteen Thousand and 00/100 Dollars ($915,000.00) (the "Purchase Price"), which shall be paid in full at the time of Closing by certified or cashier's check or by wire transfer of immediately available Federal Reserve System funds.

2.2     Adjustments.  The Purchase Price payable at the Closing shall be subject to customary prorations and adjustments as provided in this Agreement.

SECTION 3.     INSPECTIONS AND ACCESS.

3.1     Inspection Period.  Purchaser shall have a period of sixty (60) days after the date of this Agreement (the "Inspection Period"), in which to inspect the Property for all purposes whatsoever.

3.2     [Reserved].

3.3     Entry for Inspections.  Immediately upon the execution of this Agreement and continuously through the date of Closing, Seller shall make the Property available for inspection by Purchaser, and Purchaser's agents, employees and contractors, and shall disclose to Purchaser the service contractors who have been engaged to operate or maintain the Property.  During that time, Purchaser may, at Purchaser's sole risk and expense, undertake a complete physical inspection of the Property as Purchaser deems appropriate.  Purchaser agrees to indemnify and save Seller harmless against all liabilities, claims, damages, penalties, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) incurred by or asserted against Seller in connection with or arising out of the entry upon the Real Property by Purchaser or Purchaser's employees, agents or contractors (but Purchaser shall not be liable to Seller if Purchaser's inspections result in the discovery of conditions, environmental or otherwise, that may require Seller to undertake corrective measures or incur other costs).  This obligation shall survive the expiration or termination of this Agreement.

3.4     Access for Waste Removal.  Seller shall grant access to the Property from the date of this Agreement until Closing to allow Purchaser's consultants and contractors to (i) collect samples of waste materials and obsolete raw materials to characterize such wastes and materials for off-site disposal or recycling and (ii) coordinate the removal of such wastes and other materials from the Property as determined in the sole discretion of Purchaser (the "Removal Work").  Seller shall cooperate by providing information requested by Purchaser or its representatives regarding the wastes and other materials.  Seller shall sign (or cause an authorized representative of Grasan to sign) as the generator all manifests and other shipping documents using Seller's or Grasan's hazardous waste generator identification number.  Purchaser and its consultants and contractors shall not be deemed the owner or generator of the wastes or other materials removed from the Property for any purpose.  For clarity, Purchaser is given the right (but not the obligation) pursuant to this Section 3.4 to characterize and remove wastes and obsolete materials prior to the Closing in its sole discretion.  In order to secure payment of Purchaser's expenses relating to the Removal Work if Seller refuses or is unable to close in accordance with this Agreement, on or before the date of this Agreement, Seller shall execute and deliver to Purchaser a Promissory Note in an amount equal to the actual cost incurred by Purchaser for the Removal Work (such amount not to exceed $25,000), along with a Mortgage, and shall cause such Mortgage to be recorded against the Property.  In the event that Closing occurs, the Note shall become void and the Mortgage shall be released.  Purchaser's

failure to meet its obligations under this Section 3.4 shall constitute a breach under this Agreement.

SECTION 4.  TITLE AND SURVEY.

4.1     Title.  Within fourteen (14) days after the date of this Agreement, Purchaser shall obtain a commitment for an Owner's Policy of Title Insurance (the "Commitment") issued by a Penn Bridge Land and Abstract, LLC, Attn: Barb Stone, 700 McKnight Park Drive, Suite 710, Pittsburgh, PA 15237, Email: barb@pennbridge.net  (the "Title Company") and dated as of a current date, pursuant to which the Title Company shall commit to issue to Purchaser an ALTA Owner's Policy of title insurance, in the amount of the Purchase Price, insuring in Purchaser marketable fee simple title to the Real Property, subject only to the following "Permitted Exceptions":

(a)     All legal highways;

(b)     Zoning, building and other laws, ordinances, codes and regulations;

(c)     Matters disclosed by the Survey pursuant to Section 4.2;

(d)     Easements, rights-of-way, conditions, covenants and restrictions of record, to the extent that those easements, rights-of-way, conditions, covenants and restrictions do not interfere with, obstruct, or otherwise impair Purchaser's proposed use of the Real Property; and

(e)     Real estate taxes that are a lien on the Real Property, but not yet due and payable.

Any mortgage or other monetary liens on the Property ("Monetary Liens") are to be discharged and paid by Seller at the time of Closing.  At the Closing, and as a condition to Purchaser's obligations under this Agreement, the Title Company shall deliver to Purchaser the policy of title insurance in accordance with the Commitment (the "Title Policy").  Seller shall provide an affidavit and such other instruments as the Title Company may require to delete the "standard" or "general" exceptions from the Title Policy.

4.2     Survey.  Purchaser, at its sole cost and expense, may obtain an as-built survey and metes and bounds description of the Real Property prepared by a registered land surveyor or engineer, licensed in the State of Ohio, showing the acreage of the Real Property to the nearest 1/10,000th of an acre, and containing the certifications and the minimum standard detail requirements for land surveys most recently adopted by the ALTA/ACSM including all Table A specifications identified by Purchaser (the "Survey").

4.3     Defects and Cure.  Purchaser shall notify Seller of Purchaser's disapproval of any matter contained in the Commitment or the Survey on or before the last day of the Inspection Period.  Except for real estate taxes that are to be prorated at Closing and except for Monetary Liens, Purchaser's failure to notify Seller of disapproval of any matter within the foregoing time period shall be deemed approval of that matter.  If the Survey discloses conditions that are not in conformity with the criteria set forth above or that might otherwise adversely affect Purchaser's

proposed use of the Real Property or if the Commitment discloses matters other than the Permitted Exceptions and Monetary Liens (collectively, "Defects"), those Defects shall, as a condition to Purchaser's obligations under this Agreement, be cured or removed at or before the Closing.  Purchaser may, at its sole election, proceed to close this transaction notwithstanding any Defects, in which event the Defects shall be deemed additional Permitted Exceptions.  If Purchaser elects to terminate this Agreement, Purchaser shall be entitled to the remedies provided in Section 12.2, and neither party shall have any further rights or obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement.

SECTION 5.    ADDITIONAL CONDITIONS TO CLOSING.

5.1    Purchaser's Conditions.  In addition to the other conditions set forth in this Agreement, the obligation of Purchaser to close the transaction contemplated by this Agreement is subject to the following conditions that are for Purchaser's benefit and may be waived by Purchaser at its sole option:

5.1.1    The representations and warranties of Seller contained in Section 6 of this Agreement shall be true on the date of Closing in all material respects as though those representations and warranties were made on that date.

5.1.2    Seller shall not have breached any material affirmative covenant contained in this Agreement to be performed by Seller on or before the Closing.

5.1.3    Closing shall have occurred under that certain Asset Purchase Agreement dated February 18, 2021 by and between Purchaser, as purchaser and Grasan Equipment Co., as seller (the "APA").

If any of these conditions is not satisfied or waived, Purchaser shall have the right to terminate this Agreement by notice to Seller no later than the date of Closing or such earlier time as may be provided above.  In the event of termination, this Agreement shall terminate, and neither party shall have any further rights or obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement.

5.2    Seller's Conditions.  The obligations of Seller to close the transaction contemplated by this Agreement are subject to (i) Purchaser performing all affirmative covenants contained in this Agreement to be performed by Purchaser on or before the Closing and (ii) closing shall have occurred under the APA. If these conditions are not satisfied or waived, Seller shall have the right to terminate this Agreement by notice to Purchaser no later than the date of Closing or such earlier time as may be provided above.  In the event of termination, this Agreement shall terminate, and neither party shall have any further rights or obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement.

SECTION 6.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER.

      6.1   Seller's Representations, Warranties and Covenants.  Seller represents, warrants and covenants to Purchaser as to the following matters, and shall be deemed to remake all of the following representations, warranties and covenants as of the date of Closing.

          6.1.1   The execution and delivery of this Agreement by Seller, the execution and delivery of every other document and instrument delivered pursuant to this Agreement by or on behalf of Seller, and the consummation of the transactions contemplated by this Agreement, have been duly authorized and validly executed and delivered by Seller, and will not (a) constitute or result in the breach of or default under any oral or written agreement to which Seller is a party of which affect the Property; (b) constitute or result in a violation of any order, decree or injunction with respect to which Seller and/or the Property is bound; (c) cause or entitle any party to have a right to accelerate or declare a default under any oral or written agreement to which Seller is a party or which affects the Property; and/or (d) violate any provision of any municipal, state or federal law, statutory or otherwise, to which Seller or the Property may be subject.

          6.1.2   To Seller's actual knowledge, the Property is in compliance with all applicable federal, state and local statutes, laws, ordinances, orders, requirements, rules and regulations.

          6.1.3   To Seller's actual knowledge, all required building permits, occupancy permits or other required approvals or consents of governmental authorities or public or private utilities having jurisdiction have been obtained with respect to the Property.

          6.1.4   Seller has received no notice of violation of any applicable federal, state or local statute, law, ordinance, order, requirement, rule or regulation, or of any covenant, condition, restriction or easement affecting the Property.

          6.1.5   To Seller's actual knowledge, the Property is in compliance with all covenants, conditions, restrictions, easements and similar matters affecting the Property.

          6.1.6   With respect to environmental matters:

                (i)   The following definitions apply to this Section 6:

                (a)   "Environmental Laws" means all applicable federal, state and local laws (including common law), regulations, rules or ordinances, and administrative or judicial interpretations thereof, relating to pollution or protection of human health, natural resources, or the environment and the regulation of Hazardous Substances, including without limitation, the federal Comprehensive, Environmental Response, Compensation and Liability Act ("CERCLA") and analogous state laws; (b) "Hazardous Substances" means pollutants, wastes, contaminants, or chemical, industrial, hazardous, explosive or toxic materials, substances, or wastes, including, without limitation, any "hazardous substance" as defined in

Section 101(14) of CERCLA and any "solid waste" as defined in O.R.C. 3734.01, asbestos, and petroleum, oil or petroleum or oil products and derivatives; and (c) "Release" means spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, filling, or disposing into the environment.

(ii) Seller has no actual knowledge of any claim, action, investigation or notice by any person or entity alleging liability arising out of, based on or resulting from (x) the Release of any Hazardous Substance at, to, or from the Property or (y) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law ("Environmental Claim") pending or, to Seller's actual knowledge, threatened against Seller in connection with the Property and Seller has no actual knowledge of any past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release of any Hazardous Substances or violation of any Environmental Law, that could form the basis of any Environmental Claim in connection with the Property.

(iii) Seller has no actual knowledge of any Releases of Hazardous Substances at, from or to the Property which required or may require investigation, cleanup, or other corrective action pursuant to Environmental Laws.

(iv) To Seller's actual knowledge, there are no underground storage tanks, landfills, pits, lagoons or septic tanks currently or formerly on the Property in which Hazardous Substances have been placed, stored or disposed.

Purchase acknowledges that (i) any matter identified in "Purchaser's Reports" (as defined below) and not disclosed in this Section 6.1.6 shall not constitute a breach of Seller's representations and warranties contained in this Section 6.1.6; (ii) Seller has not reviewed or been provided the opportunity to review Purchaser's Reports, and as such, Seller has no knowledge (actual or implied) of any matters noted in Purchaser's Reports; and (iii) Purchaser is taking title to the Property subject to (and hereby waives any claims relating to) any and all matters identified in Purchaser's Reports. Purchaser represents, warrants and covenants to Seller that it has not received or reviewed any environmental reports or environmental diligence relating to the Property other than Purchaser's Reports. "Purchaser's Reports" means any environmental diligence conducted by Purchaser regarding the Property, including, without limitation, the following environmental due diligence reports prepared at the instruction of Purchaser:

(i) Summary of Regulatory Compliance Matters, Grasan, Inc., 440 South Illinois Avenue, Mansfield, Ohio (Ramboll US Corp. Dec. 22, 2020)

(ii) Phase I Environmental Site Assessment, Grasan Equipment Co., 440 S. Illinois Avenue, Mansfield, Ohio (Ramboll US Corp. Dec. 2020)

(iii) Limited Phase II Investigation Results, Grasan Equipment Co., Inc., 440 S. Illinois Avenue, Mansfield, Ohio (Ramboll US Corp. Jan. 2021)

6.1.7   Except as may be disclosed on the Survey, and to Seller's actual knowledge, there are no encroachments onto the Land of any improvement on any adjoining property, and there are no encroachments onto any adjoining property of any improvements on the Land.

6.1.8   There is no pending or, to Seller's actual knowledge, threatened litigation, arbitration, administrative action or examination, claim, or demand relating to the Property.  To Seller's actual knowledge, there are no attachments, execution proceedings, liens, assignments or insolvency proceedings are pending or threatened against Seller or the Property or contemplated by Seller.  Seller is not contemplating the institution of bankruptcy or insolvency proceedings.

6.1.9   There is no pending or, to Seller's actual knowledge, contemplated eminent domain, condemnation, or other governmental or quasi-governmental taking of any part or all of the Property.

6.1.10  To Seller's actual knowledge, are no public improvements that have been made or ordered to be made for which assessments may be charged to the Property, and there are no special, general or other assessments pending, threatened against, or affecting the Property.

6.1.11  There are no management contracts, service contracts or other agreements, either oral or written, pertaining to the Property that will survive the Closing or to which Purchaser or the Property will be bound.

6.1.12  Seller has paid or will pay in full all bills and invoices for labor and material of any kind arising from the ownership, operation, management, repair, maintenance or leasing of the Property, and there are no actual or potential claims for mechanic's liens, brokerage commissions or other claims outstanding or available to any party in connection with the ownership, operation, management, repair, maintenance or leasing of the Property.

6.1.13  Between the date of this Agreement and the date of Closing, Seller (a) will keep the Property insured in an amount not less than the full replacement cost of the Property against fire, flood, and other hazards by extended coverage endorsement to a policy of fire insurance, and (b) keep its existing commercial general liability insurance in effect against claims for bodily injury, death and property damage incurring in, on, or about the Property and adjoining streets, sidewalks and public areas.

6.1.14  Between the date of this Agreement and the date of Closing, no part of the Property will be sold, encumbered or transferred in favor of or to any party whatsoever.  There are no purchase contracts, options or any other agreements of any kind, oral or written, by which any person or entity other than Seller will have acquired or will have any basis to assert any right, title or interest in, or right to possession, use, enjoyment or proceeds of, any part or all of the Property.

6.1.15  Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1990, as amended.

6.2     Survival.  All of the representations, warranties and covenants made by Seller in Section 6.1, *et seq* and elsewhere in this Agreement shall survive Closing for a period of one (1) year, except for Seller's representations and warranties as to environmental matters, which shall not expire.

SECTION 7.    CLOSING AND TRANSFER OF TITLE.

7.1     Closing.  The parties agree to close this purchase and sale (the "Closing") on the date that all preconditions for closing to occur under the APA have been satisfied, in the offices of the Title Company or such other place as Seller and Purchaser may agree (including, without limitation, an escrowed closing), or such earlier date to which Seller and Purchaser may agree (the "Closing Date").  Notwithstanding anything in this Agreement to the contrary, a termination under the APA shall act as a termination under this Agreement.

7.2     Seller's Documents; Other Deliveries.  At Closing, Seller shall execute and/or deliver to Purchaser the following.

   7.2.1   A limited warranty deed to the Real Property conveying marketable, fee simple title to the Real Property to Purchaser free, clear, and unencumbered, subject, however, to the Permitted Exceptions.

   7.2.2   A Bill of Sale with full warranties of title, conveying the Personal Property, if any, to Purchaser.

   7.2.3   An assignment of any warranties, guarantees, licenses and permits with respect to the Property.

   7.2.4   All other documents and instruments referred to in Section 5.

   7.2.5   The Personal Property, if any.

   7.2.6   All blueprints, construction plans, specifications and plats in Seller's possession for all of the Improvements.

   7.2.7   An owner's affidavit as to mechanics' liens, persons in possession of the Real Property, unrecorded agreements, and such other matters required by the Title Company as a condition to its deletion of the standard exceptions relating to such matters from the Title Policy.

   7.2.8   An owner's affidavit, in form and substance satisfactory to Purchaser, signed under penalty of perjury and containing Seller's U.S. taxpayer identification number, to the effect that Seller is not a foreign person within the meaning of Section 1445(f) of the Internal Revenue Code.

   7.2.9   A certificate in affidavit form, satisfactory to Purchaser, executed by an officer of Seller, and dated as of the date of Closing, which provides that all Seller's

representations, warranties and covenants set forth in this Agreement are, as of the date of Closing, true and correct with the same force and effect as if each warranty, representation and covenant were made again at Closing.

       7.2.10  All consents that may be required from any third person or entity in connection with the sale of the Property.

       7.2.11  A certified copy of the resolution of Seller's board of directors (if Seller is a corporation) or its partners (if Seller is a partnership) or its members (if Seller is a limited liability company) evidencing authorization of the officer(s), partner(s) or member(s) acting for Seller and authorization and approval of this Agreement and the transactions contemplated by this Agreement.

       7.2.12  A written termination of the existing lease agreement by and between Seller and Grasan Equipment Corp, if any, relating to the Property.

       7.2.13  Such other documents or instruments as may be reasonably required by Purchaser, required by other provisions of this Agreement, or reasonably necessary to effectuate Closing, including, but not limited to, a closing statement. All of the documents and instruments to be delivered by Seller shall be in the form and substance reasonably satisfactory to the Title Company and to counsel for Purchaser.

       7.3    <u>Purchaser's Documents</u>. At Closing, Purchaser shall execute and/or deliver to Seller the following documents:

       7.3.1  A certified copy of the resolution of Purchaser's board of director evidencing authorization of the officer(s) acting for Purchaser and authorization and approval of this Agreement and the transactions contemplated by this Agreement.

       7.3.2  Such other documents and instruments as Seller or the Title Company shall reasonably request in order to consummate this transaction, or reasonably necessary to effectuate Closing, including, but not limited to, a closing statement.

<u>SECTION 8</u>.  <u>POSSESSION</u>.

Seller shall deliver possession of the Property to Purchaser at Closing. Between the date of this Agreement and Closing, Seller shall continue to operate the Property in accordance with its present standards and shall maintain the Property in its present condition and repair, ordinary wear and tear excepted. Purchaser hereby acknowledges and agrees that the sale of the Property hereunder is and will be made on an "AS IS, WHERE IS AND WITH ALL FAULTS" basis subject, however, to the express (and no implied) representations of Seller contained in this Agreement.

SECTION 9. PRORATIONS AND EXPENSES.

       9.1     Proration of Real Estate Taxes. Real estate taxes and any assessments that are Permitted Exceptions shall be prorated as of the date of Closing in accordance with the customary method of proration in Richland County, Ohio, based upon the most recent tax bills issued. After the Closing, Seller and Purchaser shall reprorate the real estate taxes and assessments based on the actual taxes and assessments when the real estate tax bills for the year of Closing are issued. A further reproration shall be made in the event of any subsequent readjustment of the taxes or assessments for the year of the Closing.

       9.2     Utility Expenses; Miscellaneous Expenses. Final readings on all gas, water and electric meters shall be made as of the date of Closing, if possible. Seller shall be responsible for all charges for consumption of utilities prior to the date of Closing and Purchaser shall be responsible for utility charges from and after the date of Closing. Any deposits made by Seller with utility companies shall be returned to Seller. Purchaser shall be responsible for making all arrangements for the continuation of utility services. The parties will prorate, as of the date of Closing, any miscellaneous income and expenses related to the Property.

       9.3     Estimates. All items that are not subject to an exact determination shall be estimated by the parties. When any item so estimated is capable of exact determination after Closing, the party in possession of the facts necessary to make the determination and the parties shall adjust the prior estimate within 10 days after both parties have received the reports. Either party will be entitled, at its own expense, to review the records supporting the determination made.

SECTION 10. CONDEMNATION OR CASUALTY.

       10.1    Condemnation. If between the date of this Agreement and the date of Closing all or any portion of the Property is taken or is made subject to condemnation, eminent domain or similar governmental or quasi-governmental acquisition proceedings, then the following provisions shall apply. If Seller receives a written notice from any governmental or quasi-governmental authority with powers of eminent domain to the effect that a condemnation as to any portion or all of the Property is pending or contemplated, Seller shall notify Purchaser promptly after receipt of the notice. If the proposed or pending condemnation is one that could reasonably be expected to render any portion of the Real Property untenantable, then Purchaser may, upon receipt of notice of the event, cancel this Agreement at any time prior to Closing, in which event the Deposit and any interest on the Deposit shall be returned to Purchaser, this Agreement shall terminate, and neither party shall have any further rights or obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement. If Purchaser shall not elect to terminate, then this Agreement shall remain in full force and effect, and Seller shall be entitled to all monies received or collected prior to the Closing by reason of the condemnation. In that event, this transaction shall close in accordance with the terms and conditions of this Agreement except that there will be an abatement of the Purchase Price equal to the amount of the gross proceeds received by Seller. If, however, Seller has not received any proceeds by reason of such condemnation prior to the Closing and Purchaser does not elect to terminate Purchaser's obligations under this

Agreement, then the Closing shall take place without abatement of the Purchase Price, and Seller shall assign and transfer to Purchaser at Closing by written instrument all of Seller's right, title and interest in any condemnation awards.

10.2     Casualty.  In the event of substantial loss or damage to the Property prior to the Closing due to fire or other casualty, Purchaser may, at any time after receipt of notice or knowledge of that event, cancel this Agreement, in which event the Deposit and any interest on the Deposit shall be immediately refunded, this Agreement shall terminate and neither party shall have any further rights or obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement.  If Purchaser does not elect to terminate, or if the loss or damage is not "substantial," then this Agreement shall remain in full force and effect and Purchaser shall proceed to close and take the Property as damaged, in which event Purchaser shall be entitled to receive the insurance proceeds plus the amount of any deductible, co-insurance or self-insurance carried by Seller, so that Purchaser shall receive, in effect, the full replacement cost of the loss or damage, as the cost is determined in the settlement with the insurer.  Seller and Purchaser shall each be entitled to participate in the settlement.  As used in this Section 10.2, the term "substantial" means any loss or damage to the Property that the parties reasonably estimate will require more than 30 days to repair or restore.

SECTION 11. [INTENTIONALLY DELETED]

SECTION 12.  DEFAULT.

12.1     Purchaser's Default.  If Seller is ready, willing and able to convey the Property in accordance with this Agreement, and Purchaser is obligated under the terms of this Agreement to consummate the transaction evidenced by this Agreement but fails to consummate this Agreement and take title, the parties recognize and agree that the damages Seller will sustain will be substantial, but difficult if not impossible to ascertain.  Therefore, the parties agree that, in the event of Purchaser's default, Seller shall be entitled to liquidated damages in the amount of $20,000.00 ("Liquidated Damages") as compensation and not a penalty.  Seller's right to receive the Liquidated Damages shall constitute the waiver by Seller of all other rights and remedies against Purchaser except for those rights and/or obligations that are expressly stated to survive the termination of this Agreement.

12.2     Seller's Default.  If Purchaser is ready, willing and able to acquire the Property in accordance with this Agreement, and Seller is obligated under the terms of this Agreement to consummate this transaction but fails to do so, Purchaser shall be entitled to reimbursement for its reasonable due diligence fees and expenses, not to exceed $20,000.00.  Following payment of the Purchaser's reasonable due diligence fees and expenses, the parties shall have no further rights and obligations under this Agreement other than those rights and/or obligations that are expressly stated to survive expiration or termination of this Agreement.

12.3     Expense Reimbursement Upon APA Overbid and Closing.  If Purchaser is ready willing, and able to acquire the Property in accordance with this Agreement, but Seller determines to sell the Property to another party in connection with a sale of the assets of Grasan

Equipment Co. ("Grasan") pursuant to the APA (an "Alternative Transaction"), then concurrently with the closing of an Alternative Transaction by the Seller, and no later than two (2) Business Days following any closing, Seller shall immediately pay to Purchaser in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser, an amount equal to 50% of the reasonable costs and out-of-pocket expenses incurred by Purchaser in connection with its business, legal and accounting due diligence and the preparation and negotiation of this Agreement and the APA (the "Expenses") up to a maximum of $70,000.00 (the "Expense Reimbursement").  To the extent Purchaser is entitled to a recovery of expenses from Grasan as well, the total amount to be paid to Purchaser by Seller for Expense Reimbursement shall also not exceed the lesser of (a) 50% of the Expenses less any amount of Expenses paid by Grasan; and (b) $85,000 less any amount of Expenses paid by Grasan.  For avoidance of doubt, Purchaser cannot recover both and Expense Reimbursement under this paragraph 12.3 and default damages under paragraph 12.2.

SECTION 13. BROKER.

Each party represents and warrants to the other that it has dealt with no agent or broker who has in any way participated in the sale of the Property.  Each party agrees to indemnify and hold the other harmless against any and all claims, judgments, costs of suit, attorneys' fees and other reasonable expenses that the other may incur by reason of any action or claim made against the other by any agent, advisor or intermediary appointed by or instructed by Seller or Purchaser, as the case may be, arising out of this Agreement or the sale of the Property to Purchaser.

SECTION 14. ASSIGNMENT.

This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns.  Purchaser shall not assign this Agreement or any portion thereof to any entity without Seller's prior, written consent which shall not be unreasonably delayed, withheld or conditioned, except Seller's consent shall not be required for an assignment to an entity controlling, controlled by or under common control with Purchaser (an "Affiliate").  No assignment, whether to an Affiliate or otherwise, shall release Purchaser from its obligations under this Agreement.  In the event that Purchaser shall elect to assign this Agreement to an Affiliate, Purchaser shall send written notice of such assignment to Seller and to the Title Company.

SECTION 15. NOTICES.

All notices permitted or required under this Agreement shall be in writing, and shall be deemed properly delivered when deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested, or sent by a nationally recognized overnight courier service, addressed to the parties at their respective addresses set forth below or as they may otherwise specify by written notice delivered in accordance with this Section:

| As to Purchaser: | Terex USA, LLC |
| --- | --- |
| | 45 Glover Avenue, 4th Floor |
| | Norwalk, Connecticut 06850 |
| | Attn: Alex Sherman |
| | E-mail: alex.sherman@terex.com |
| | |
| With a copy to: | Thompson Hine LLP |
| | 312 Walnut Street, Suite 1400 |
| | Cincinnati, Ohio 45202 |
| | Attn: Kris Brandenburg |
| | E-mail: kris.brandenburg@Thompsonhine.com |
| | |
| As to Seller: | Edward Eilenfeld Jr. |
| | c/o Grasan Equipment Corp. |
| | 440 South Illinois Avenue |
| | Mansfield, Ohio 44907 |
| | Attn: eeilenfeld@icloud.com |
| | |
| With a copy to: | McDonald Hopkins LLC |
| | 600 Superior Ave., Ste. 2100 |
| | Cleveland, OH 44114 |
| | Attn: David H. Gunning II, Esq. |
| | Email: dgunning@mcdonaldhopkins.com |

SECTION 16. EXPENSES.

Seller shall pay the transfer tax, conveyance fee or similar charge in connection with the sale of the Real Property, along with recording charges for the deed. Purchaser shall pay for all costs, fees and premiums of the Survey, Commitment and Title Policy. Any other miscellaneous closing expenses properly allocable to both parties shall be divided equally between Purchaser and Seller. Each party shall pay for its own legal and accounting fees and incidental expenses.

SECTION 17. COOPERATION.

From time to time at the request of Purchaser, and without further consideration, Seller shall execute and deliver, and/or join with Purchaser in executing and delivering, such applications for licenses, variances, zoning changes, approvals, permits and consents from governmental bodies, utility companies, financial institutions and other entities and shall supply such information, arrange such meetings, and execute such forms and take such action as Purchaser may reasonably request in order to proceed with and fully implement Purchaser's use of the Property or to effectuate the transactions contemplated by this Agreement; provided, however, that Seller shall not be required to incur any expenses in connection with these matters, nor shall any permanent changes be made to the status of the Real Property (zoning or otherwise) prior to the Closing without Seller's consent (which shall not be unreasonably withheld). Seller shall not file an objection to or oppose Purchaser's intended use of the Property.

SECTION 18.  MISCELLANEOUS.

     18.1    Gender.  Words of any gender used in this Agreement shall be held and construed to include any other gender, any words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

     18.2    Attorneys' Fees.  If either party commences an action against the other to enforce any of the terms of this Agreement or because of the breach by either party of any of the terms of this Agreement, the losing or defaulting party shall pay to the prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.  The term "prevailing party" means the party obtaining substantially the relief sought, whether by compromise, settlement or judgment.

     18.3    Captions.  The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit, or prescribe the scope or intent of this Agreement or any part of this Agreement.

     18.4    Construction.  No provisions of this Agreement shall be construed by any court or other judicial authority against any party by reason of that party's being deemed to have drafted or structured the provisions.

     18.5    Entire Agreement.  This Agreement constitutes the entire contract between the parties and supersedes all prior understandings, if any.  There are no other oral or written promises, conditions, representations, understandings or terms of any kind as conditions or inducements to the execution of this Agreement and none have been relied upon by either party.  Any subsequent conditions, representations, warranties or agreements shall not be valid and binding upon the parties unless in writing and signed by both parties.

     18.6    Recording.  The parties agree that this Agreement shall not be recorded.

     18.7    Time of Essence.  TIME IS OF THE ESSENCE OF THIS AGREEMENT.

     18.8    Original Document.  This Agreement may be executed by the parties in separate counterparts, each of which shall be deemed an original, but all of the counterparts taken together shall constitute one and the same Agreement.

     18.9    Governing Law.  This Agreement shall be construed, and the rights and obligations of Seller and Purchaser shall be determined, in accordance with the laws of the State of Ohio.

[Signature page follows]

SIGNED as of the day and year first above written.

PURCHASER:

TEREX USA, LLC, a Delaware limited liability company

By: _____
    Name: Scott Posner
    Title: Senior Vice President


SELLER:

440 S. ILLINOIS LIMITED PARTNERSHIP, an Ohio limited partnership


By: _____
    Name:
    Title:

EXHIBIT A

Legal Description

4834-2023-6253.1